## THE PLANTERS AND MERCHANTS' BANK OF MOBILE v. WALKER, ET AL.

1. Where a Court of law in which a party has instituted an action, upon the allegation that a suit pending in equity is for the same identical cause, makes an order that he elect, whether he will proceed at law, or in Chancery; such order will not be conclusive of the case in Chancery, but the Chancellor will be free to exercise his own judgment upon the motion to elect: and this, although a forced election shall have been made and entered of record at law.

2. The bill alledged that several conveyances were made by the defendants to a judgment at law, of all their visible property, that several of these conveyances were fraudulent in their inception, that others were either conceived in fraud, or held up with the view of delaying or defeating the creditors of the grantor : *Held*, that these allegations were sufficient to give to a Court of equity jurisdiction of the cause.

3. Where executions are levied on property, which the defendant in execution had sold and mortgaged, the plaintiff may notwithstanding go into equity in order to vacate the conveyances *in toto;* the only effect of the levies on the remedy in Chancery, would be, upon the interposition of a claim of property, to compel the plaintiff to elect (if the matters in controversy were identical,) whether the suit should be prosecuted at law, or in equity.

4. Although it may be necessary to entitle a judgment creditor to come into equity to subject the equitable estate of his debtor, that he should have pursued his legal

remedies to every available extent, without being able to obtain satisfaction; yet he may file his bill, upon the assumption that the defendants in execution have made several gratuitous or voluntary transfers of property, with the intent to *delay, hinder or defraud creditors:* or where, admitting the conveyances were made to secure debts which have since been paid, they are now held up to enable the grantor to defraud his creditors.

5. In a bill to set aside and avoid conveyances of land, slaves, &c., upon an allegation of fraud, it appeared that the grantors were in debt, and believed to be insolvent at the time the deeds bear date; each of the grantors conveyed his entire visible estate; the one to his father-in-law, the other to his brother-in-law; the one on the payment of the purchase money in ten annual instalments, the other on payments to be made at different periods, the last of which was twelve years after the sale; in the one case the use of the lands and the employment of the slaves, would enable the purchaser to pay the stipulated price in six or eight years, in the other in eight or ten years. The father-in-law said his object in making the purchase was to save the property, and he thought he could make it pay for itself on the credit obtained. After the sale, the son-in-law acted professedly as the overseer of his vendee. Since the sale by the brother-in-law he has exercised a control over blacksmiths and shop, over wagons and teams employed in hauling wood from the plantation for sale, all of which are embraced by his conveyance; but the vendee has employed overseers on the plantation. In respect to both it may be said, that the vendees have shipped the cotton crops growed on the respective plantations to market. The witnesses know of no change of property from either of the vendors; they each live where they did at the time of their sales, have their carriages, house servants, &c.—and live in the neighborhood of each other: *Held,* that both conveyances were made "to delay, hinder or defraud" the creditors of the respective vendors and must be set aside.

6. Joint judgments were recovered by the complainant against the defendants, G. W., J. H. W., and R. L., all of whom it was alledged in the bill, united in a fraudulent purpose to defeat the collection of these judgments—the two former made absolute sales, professing to pass the possession and property to their respective vendees—the latter executed mortgages. All these transactions are charged to have been fraudulent, not only on the part of the defendants in the judgment, but of their vendees and mortgagees: *Held,* that as the defendants in the judgment had a common interest in its satisfaction, and are charged with a joint participation in a design to defraud, which led to the supposed fraudulent tranfers, a bill which makes them all parties, and seeks to set aside their respective conveyances, is not multifarious.

7. An application to continue a cause in equity, addresses itself to the discretion of the Chancellor, and however unwisely exercised, cannot be revised in an appellate Court.

8. When at the time a commission to examine witnesses issued, but one of the defendants had answered, and his counsel were duly notified of the time and place when the commission would be executed; the other defendants were in default, and a decree *pro confesso* had been rendered against them: *Held,* that the defendants who were in default cannot insist upon the want of notice, but it was competent for the plaintiff, under the statute, to make out his case by testimony taken *ex parte.*

9. If a defendant who is in default afterwards answers, so that a decree *pro confesso* is set aside, depositions taken without notice to him while the decree was operative, will not become inadmissible evidence. The correct practice in such case is, upon the decree being set aside, for the defendant to move upon a proper showing for leave to take the depositions of the same witnesses at his own instance, and a commission could issue on such terms as would protect the complainant.

Writ of error to the Court of Chancery sitting at Hayneville:

On the 25th of November, 1842, the plaintiff in error filed its bill setting forth, that on the 24th of May, 1841, it recovered two several judgments against George Walker, John H. Walker, and Robert Lowe, on two distinct demands; one for $6,406 28-100, besides costs; the other for $6,464 11-100, besides costs. Each judgment was rendered on several promissory notes made by J. B. Wilkins, as principal, and the persons above named, together with Boling Smith, as sureties, on the 1st January, 1838.

Original and *alias fi. fas.* were issued on these judgments, and returned, "No property found." On the 16th of May, 1842, *pluries fi. fas* were issued, and placed in the hands of the sheriff of Lowndes, with instructions to levy the same, if property could be found liable to seizure.

George Walker, John H. Walker, and Robert Lowe, have so artfully and fraudulently arranged and conveyed their property, both real and personal, that they have no title to the same in their own names; and they pretend to have no estate subject to levy and sale under execution. Other persons not parties to the judgments, assert that all the property of these defendants in execution, belong to them under conveyances thereof; and the sheriff consequently refuses to levy thereon.

The bill then alledges, that the defendants in execution have equitable interests, in choses in action, real and personal property, of value more than sufficient to satisfy the judgments, which the agents and attorneys of the complainants have been unable to discover, and reach by execution, in consequence of the fraudulent conveyances and covenous arrangements of themselves, their relatives and confederates. That about the 8th September, 1840, George Walker, for a fictitious or assum-

ed consideration of $8,200 00, conveyed a large body of land (which is particularly described in the bill) to his brother-in-law, David A. Steele; and about the same time, made a fraudulent conveyance of *all his personal property*, consisting of forty or fifty negroes, at the least, besides horses, mules, &c.

*Further :* about the time the two notes were made on which the judgments were rendered in favor of the plaintiffs, Wilkins, the principal, conveyed to George Walker, by way of mortgage to secure the payment of the same, about ten negroes. The mortgage authorized the mortgagee to sell the property to pay the notes, and another debt of a like nature, but for a less amount between the same parties. That shortly thereafter, George Walker sold nine negro men, (being the same mortgaged to him by Wilkins,) to J. H. Walker, for a sum not less than $9,000 00, who worked them profitably for several years without paying any thing for them; and then they permitted, and caused these slaves to be sold at a price much below the amount J. H. W. was to pay for them, and appropriated the proceeds to the payment of the smaller debt provided for in the mortgage.

The bill also states, that when the negroes were mortgaged, Wilkins transferred and delivered to Geo. W. and J. H. W., or one of them, a promissory note made by Messrs. King and Curry, amounting to more than $10,000 00, under an agreement, that the proceeds should be applied to any balance that might remain unpaid on the notes of which the plaintiff was proprietor. Messrs. K. & C. soon paid their note. This sum, with the proceeds of negroes sold, when added to the value of two others, which, it is alledged, continue in the secret service of G. W. and J. H. W., afforded ample means to pay the notes—all of which were furnished by Wilkins, the principal.

The complainant further states, that on the 27th September, 1840, J. H. Walker sold a tract of land, (particularly described in the bill,) containing five hundred and eighty-five acres, for the pretended consideration of $6,000 00. This contract recites, not only the sale of the land, but also professes to dispose of sixty-eight negroes, and every thing else pertaining to his plantation and house, to his father-in-law, A. Borland. In consideration of which, Borland agreed to pay certain debts of J. H. W. give his notes for the balance payable at different

117

periods; the last of which, was to become due on the 1st of March, 1852.

It is also alledged, that Robert Lowe, on the 11th of March, 1840, under the pretence of securing to Messrs. Anderson, Willis, & Co., the sum of $4,000 00, conveyed to them certain negro slaves by way of mortgage, with a power of sale. On the 6th of June, 1840, he conveyed certain land, (particularly described in the bill,) and other slaves, to George Pylant, to indemnify him against the liability to pay certain debts for which he was Lowe's surety. This latter conveyance was, by way of mortgage, with a power of sale, for cash, or on credit, at public, or at private sale : it also provided, that after the payment of the debts for which Pylant was the surety, then the balance (if any) in his hands, should be paid to such creditors of Lowe as might present their claims.

The debts pretended to be secured by the mortgages to Willis & Co., and to Pylant, it is alledged, never had an existence, or if they had, it was for a much less amount than the mortgages recite; they have been fully paid off, and are now set up for the purpose of defrauding the creditors of the mortgagor. *Further,* if these mortgages were ever valid, they have lost their lien by the delay of the mortgagees to foreclose them, and the mortgagor's continued possession of the property mortgaged.

It is charged, that the defendants, Wilkins and Smith, have transferred all their estates—some of it, with the intention to delay, hinder and defeat creditors, and have no property that can be reached by the complainant's execution ; and openly pretend to have nothing, &c. Other persons have long since claimed, and still continue to claim, all the property, that at any time belonged to either Wilkins or Smith.

The complainant also alledges, that J. B. Wilkins, Boling Smith, and J. H. W. have respectively filed their applications for the benefit of the bankrupt law.

It is further charged, that G. W., J. H. W., and R. Lowe, have each been permitted to remain in possession of the property conveyed by them respectively, to Steele, Borland, and Willis & Co., and Pylant; that the design of all the parties, was, to protect the property embraced by the conveyances from execution, and thus defeat the just claims of creditors.

G. W., J. H. W., and R. L., each, conveyed all the property they respectively owned, in the manner above stated.

All the parties whose names are mentioned as participating in the several transactions stated, are made parties to the bill; many very searching inquiries growing out of the case are addressed to them; and the bill prays, that G. Walker, J. H. Walker, R. Lowe, J. B. Wilkins, and B. Smith may come to an account, and they, and confederates be decreed to pay the amount of the judgment. In default of such payment, then all the estate, legal or equitable, to which either of them shall be entitled, in possession or expectancy, may be converted into money, and appropriated under the direction of the Court, to the payment of the judgments in favor of the complainant. *Further*, that a receiver may be appointed to collect and take charge of the money, choses in action, and other property that may be found liable to the plaintiff's executions, or to which either of the defendants, whose property is sought to be reached, may be entitled; that such receiver may be invested with all power that is usual, necessary and appropriate to the case.

There is also a prayer for general relief, and that an injunction issue restraining and forbidding each of the defendants, from assigning, or making any other disposition of the real and personal property, in possession or action, to which the plaintiff may be entitled, in order to satisfy its judgment; and also to restrain them from collecting any money, &c. *And, lastly,* that process of *subpœna* may issue, &c.

David A. Steele answered the bill on the 16th of December, 1842. He admits, that he purchased of G. Walker, eighty-two negroes, twenty-six mules, four horses, five wagons, a carriage, cattle, hogs, household and kitchen furniture, for the sum of thirty-seven thousand, eight hundred dollars: also, eleven hundred acres of land for the sum of eight thousand two hundred dollars. The prices agreed to be paid by him, he insists was a full and fair consideration for all the property purchased, and denies all fraud, or any intention to defeat the creditors of his vendor. He states, that he received a bill of sale for the personal property, and a deed for the land; the latter has been duly recorded, and both he has ready to produce.

Defendant admits, that the sale was upon a credit, and pay-

ment was to be made in annual instalments of three thousand, five hundred dollars, until all the purchase money was paid; and affirms, that he made and delivered to G. W. his notes payable accordingly. He states, that he has made many payments to his vendor, and his creditors; has paid eight of the notes, which he now has in his possession, besides paying money (amount not recollected) credited on some of the other notes. In addition to this, he has other demands against G. W. for money paid for him, which have not yet been adjusted between them, but which he is satisfied will be acknowledged to be just.

Two of the notes made by this defendant, he understands have been transferred to B. Mock. Several of the slaves purchased by the defendant of Walker, have been levied on as the property of the latter, to satisfy the execution described in the complainant's bill; the defendant has interposed a claim of property, and an issue is now pending in the Circuit Court of Lowndes to try the right to these slaves. The answer insists, that the complainant cannot proceed at law and in equity at the same time, and prays, that it may be put to an election; it is further insisted, that the answer may be taken as a demurrer to the bill.

The answer of Robert Lowe was verified on the 17th December, 1843. So far as it is necessary to recite it, it may be thus condensed : defendant admits that he had no property on which the plaintiff's execution could be levied, unless it was an equity of redemption in certain property he had mortgaged to Anderson, Willis, & Co. He admits, that the complainant's judgments were obtained on two promissory notes as stated in the bill.

Defendant also admits, that he was the owner of the slaves, land, and other property, as stated in the bill; that in March, 1840, he made the mortgage on the slaves to secure to A. Willis & Co., the sum of four thousand, three hundred and sixtynine 27-100 dollars. In June, 1840, he conveyed the land and negroes to George Pylant, upon the trusts, and with the power recited in the bill. Defendant affirms, that these several conveyances were honestly made, to secure *bona fide* debts, and not with the design or intention to delay, hinder, or defeat his creditors. That the debts were not for less sums than those

mentioned in the mortgages.    He admits, that the debt due by
him to the Branch Bank  at Montgomery, and  intended to be
secured in one  of the mortgages, has  been  reduced to about
one thousand dollars; and that, on the 20th of September,
1840, he paid to  A.  Willis ninteen hundred and six 39-100
dollars—these are  all the  payments made  by this defendant,
"or any one else for him, to his knowledge or belief."

Defendant admits, that he has been permitted by A.  Willis
& Co., and G. Pylant, to  remain in possession of the  property
respectively conveyed to them; but without any secret under-
standing, or concerted design to prejudice his creditors, or ben-
efit him.    He denies, that he has equitable  interests, choses in
action, &c., on  which there are no  prior  liens, subject to  the
complainant's execution.

Defendant alledges, that the complainant caused one of  the
executions referred to in the bill,  to be levied on some  of the
slaves embraced  by the mortgage to  A.  Willis & Co., and a
claim of property being interposed, and a trial about to be had,
he dismissed  this  suit so far as it  related to the slaves then in
controversy.    He insists upon this as a bar *pro tanto,* and de-
murs to the bill  for multifariousness.

A. Borland's answer was filed on  the 1st January, 1844.
He admits, that during the year 1841, and since, J. H. Walker
had no visible property on which executions could be levied;
that on the 27th of September,  1840, a contract for the pur-
chase of his (J. H. W.'s) land, negroes, &c. was consummated;
and that this defendant, in virtue thereof, became the  proprie-
tor of them.    He denies, that he knew of  suits pending,  or
judgments obtained against J. H. W., at the time the purchase
was made, but he has since ascertained, that such was the fact.
Defendant supposed, that he  owed the debts designated in the
contract, and  some inconsiderable sums, when, in truth, there
were  judgments and executions outstanding,  which operated
a lien on the  property ;  some of these the defendant has paid,
and under others, five negroes have been sold, and five  others
adjudged liable to their satisfaction.

Defendant denies, that he intended  to aid in defrauding the
creditors of  J. H. W.; admits that he purchased all his proper-
ty, real and personal, subject to execution, with very inconsider-

able exceptions, and insists, that the price stipulated by the contract was real, and a fair equivalent for what he was to receive. He insists, that he took possession of the property immediately after his purchase, and employed and paid the overseers from that time with his own means, except as hereafter stated; and denies, that J. H. W. received and appropriated the rents, issues and profits to his own use.

It is admitted, that J. H. W. continued to occupy the house in which he resided at the time the contract was made; because defendant had no use for the house, and because Mrs. Walker was his daughter. For the latter reason he permitted the house servants to remain with the family of his vendor. The carriage, which was old, has, for similar reasons, been permitted to be used by them. The defendant further states, that the house servants referred to have been settled on Mrs. Walker, and that she now holds them under deed declaring her interest.

Defendant affirms, that he has paid large sums of money in extinguishment of the debts designated in the written contract, and substituted his own, and other paper for the residue. The aggregate of all which, amount to the sum of thirty-five thousand seven hundred dollars; besides many small sums not recollected. The cash value of all the property purchased by this defendant of Walker, was estimated by him at twenty thousand dollars, and on the terms stipulated, about thirty-two thousand. The answer is drawn out at great length; states the contract, the most of the debts paid and assumed, &c., with particularity.

In the answer, a demurrer to the bill is insisted on for multifariousness. Defendant also insists, that as some of the slaves were levied on to satisfy one of the executions, to which he interposed a claim, and an issue was made up, to try the right, and under an order of the Circuit Court, the plaintiff elected to dismiss the bill, so far as it related to the same slaves, it was bound by such forced election; and the defendant pleaded the same in bar *pro tanto* to this suit.

J. H. Walker's answer was filed on the 1st January, 1844. He declares, that the sale made of his property to A. Borland was *bona fide*, and for a full price; that the debts which his vendee undertook, by the writing, to pay for him, were justly

Planters & Merchants' Bank v. Walker, et al.

due to the persons therein named.　Admits, that he did not inform Borland of his indebtedness, further than is shown by their contract, and his object in selling his property on time, was, that, it might yield a larger sum of money.　He disclaims all intention of delaying, or defeating his creditors, adopts the answer of Borland, so far as it relates to the sale, condition of the property, &c., and demurs to the bill for multifariousness.

G. Walker's answer was filed simultaneously with that of the last named defendant.　Like him he also demurred to the bill for multifariousness; insisted that his sale of property to D. A. Steele was made in good faith, for an adequate consideration, and without an intention to defeat or defraud his creditors.　He adopts the answer of Steele, so far as it relates to their transactions with each other, the condition of the property, &c.

George Pylant died after the bill was filed; his death was suggested, and as to him the suit was suffered to abate.　Publication was made, as to Boling Smith, and the members composing the firm of A. Willis & Co.—all of whom, it appears, were non-residents, and the other defendants being served with *subpœna*, and having failed to answer within the time prescribed by statute and the rule of Court, the bill, as to all the defendants (with the exception of Steele) was taken as confessed, in May and July, 1843.

Affidavits were filed by Borland, Steele and Lowe, stating, some of the slaves, in which it appeared, by the bill, they were respectively interested, had been levied on by one, or both the plaintiff's executions, that claims had been interposed to them, and issues made up pursuant to the statute, to try the right: thereupon, they moved that the records of the causes might be inspected by the Chancellor, and the plaintiff constrained to elect, (so far as the subject matter of the suits were identical,) whether it would proceed at law or in equity, and *pro tanto* dismiss the one suit or the other.　The Chancellor overruled the motion, except as to Borland; as to him, the motion was sustained, under the impression, that a previous election made under an order of the Circuit Court was obligatory and conclusive, and had been so adjudged by this Court.

The defendant Steele, prayed the Court to grant a continuance of the cause, (after it was called for final hearing,) and

submitted an affidavit, setting forth facts that he could prove by witnesses, not examined, whose names he mentioned. Borland and Lowe also prayed a continuace, upon the ground stated by Steele, and for the additional reason, that they had not been served with a copy of the interrogatories on which the plaintiff's witnesses were examined, or been otherwise informed of the time and place of taking their depositions. The Chancellor held, that as a general appearance was entered by two solicitors who were practising in partnership, and one of them had accepted service of the interrogatories and received a copy of the same—*and further*, the bill being taken as confessed as to all the defendants but Steele, for a failure to file their answers, the motions for a continuance, and to suppress the depositions must be overruled.

The cause being submitted for hearing, the Chancellor was of opinion, that to entitle a judgment creditor to come into equity to subject the equitable estate of his debtor, or property which he has fraudulently sold and conveyed to others, he must have pursued his legal remedies to every available extent, without being able to obtain satisfaction of his judgment. This, he assumed, the plaintiff had not done in the present case, because the levies under the *pluries fi. fas.*, were undisposed of—the trials of the right of property not being determined. The bill states the return of "no property found," to the *original* and *alias* executions, but does not show that the *pluries* had been returned; this, the Chancellor supposed, was a defect, fatal to the bill, even if the ground stated above did not appear from the answers and proof.

The bill was accordingly dismissed with costs.

R. SAFFOLD, for the plaintiff in error, made the following points: 1. The order of the Circuit Court, requiring the complainant to elect whether it would proceed at law against Borland and Messrs. A. Willis & Co. was irregularly made, and should have been wholly disregarded by the Chancellor. [36 Rule of Chancery Practice, Clay's Dig. 616; Duvall's heirs v. McLoskey, 1 Ala. Rep. N. S. 708, 720, 748.] If the order of election was made in conformity to the rule and practice, it should be here vacated, because the suits at law and the bill in this case, is not for the same cause; but the latter is much

Planters & Merchants' Bank v. Walker, et al.

more extensive in its design, and embraces many subjects of litigation with which the former has no connection.

2. In respect to the equity of the bill, the complainant seeks to set aside certain conveyances alledged to be fraudulent, to discover and subject property, real and personal, choses in action, &c., in which the judgment debtors have expectant interests, and in respect to which secret trusts have been created for their benefit. All these matters are not cognizable at law. True, in respect to the mortgagor's equity of redemption, if they are in possession, this may be sold under the executions; or the validity of the conveyance of the personalty may be litigated at law. But the remedy in equity is not only concurrent, it is also more comprehensive; there, by a single suit all matters in controversy may be adjusted, and complete justice done to all parties concerned. [Magee v. Carpenter, 4 Ala. Rep. 469; Chambers v. Mauldin, Id. 477; P. & M. Bank v. Willis, 770; Livingston v. Kane, 3 John. Ch. Rep. 224; Storm v. Badger, 8 Paige's Rep. 130 ]

3. The return of the executions, "no property found," entitled the complainant to go into equity against equitable interests, to remove obstructions to the satisfaction of the executions, by levy and sale of property; as well as to reach other property against which there was no legal remedy. [Cuyler v. Moreland, 6 Paige's Rep. 274; 2 Hoff. Practice, 118, and cases there referred to, and on pages 117-9.]

4. The rule which requires that a plaintiff must have exhausted his legal remedies, before he can go into equity, to subject the equitable interests of the defendant to the payment of a judgment, interposes no objection to the bill in the present case. Here the plaintiff's executions were duly returned, "no property found," and the levies of the *pluries fi. fas.*, since an adverse claim has been interposed to the property seized, cannot impair the right to proceed in Chancery, which before became complete. Burk v. Brown, 4 John. Ch. Rep. 671, 676; Scriven v. Bostick, 2 McC. Ch. Rep. 410; Lucas, et al. v. Atwood, et al. 2 Stew. Rep. 378; Williams v. Brown, 4 J. Ch. Rep. 682-4, are cases on which the Chancellor relied to show that the bill was wanting in equity. These decisions are not controverted, but they are unlike the present case, both in their facts and the principles on which they rest.

118

To show that the case made by the bill was one in which Chancery should interfere, the plaintiffs counsel cited McDermot v. Strong, et al. 4 John. Ch. Rep. 687; Edmunston v. Lyde, 1 Paige's Rep. 637; Beck v. Burdit, Id. 305; Story's Eq. Plead. 102-3-4:2 Barbour's Ch. Prac. 151-6, (note 1,) 154, 158, 162; Hendrick v. Robinson, 2 John. Ch. Rep. 283, 312-3; Clarkson v. De Peyster, et al. 3 Paige's Rep. 320; McElwain v. Willis, Id. 320; Van Cleek v. Sickles, 5 Id. 505; Com. B. of L. Erie v. Meach, 7 Id. 449; 2 Hoffman's Ch. Prac. 121; Livingston v. Ram, 3 John. Ch. Rep. 224; Wiggins v. Armstrong, 2 Johns. Ch. Rep. 144; Shirley v. Watts, 3 Atk. Rep. 200; Chamberlaine v. Temple, 2 Rand. Rep. 385; Hadden v. Spader, 20 John. Rep. 554; Wakeman v. Grover, et al. 4 John. Ch. Rep. 23; Moffat v. Ingham, et al. 7 Dana's Rep. 495; Newgate v. Lee, 9 Id. 17, 20; Wakeman v. Grover, 4 Paige's Rep. 637; Cassidy v. Meacham, 3 Id. 311; Leggett v. Hopkins & Smith, 7 Id. 149; Bean v. Smith, 2 Mason's Rep. 252; see, also, 7 Paige's Rep. 56; 1 Verm. Rep. 399; 3 Atk. Rep. 200; 4 J. B. Moore's Rep. 163; Doe ex dem. Davis v. McKinney, 5 Ala. Rep. 719; 1 Story's Eq 366, 370.

5. The bill has a single object in view, and although some of the defendants may have no connection with each other, but claim severally, under distinct conveyances, different portions of the property in question, yet the bill is not obnoxious to the objection of multifariousness. [Boyd, et al. v. Hoyt, et al. 5 Paige's Rep. 65; Clarkson v. De Peyster, 3 Id. 320; Fellows v. Fellows, 4 Cow. Rep. 682; Stafford v. Mott, 3 Paige's Rep. 100; Cuyler v. Moreland, 6 Id. 273-7; 2 Barbour's Ch. Prac. 156; Cummings & Cooper v. McCullough, 5 Ala. Rep. 324; Story's Eq. Plead. 233-4, 408 9 10-11-12; 2 Hoffm. Ch. Prac. 121; Child v. Brace, 4 Paige's Rep. 315; Gleason v. Gage, 7 Id. 123.]

6. The conveyances in question are fraudulent in point of fact, and some of them bear upon their face such marks of fraud, as should induce a Court of Equity at least to declare them void. [Gazzam v. Poyntz, 4 Ala. Rep. 374; Hyslop v. Clark, 14 John. Rep. 458; Sands v. Codwise, et al. 4 Johns. Rep. 536; Austin v. Bell, 20 John. Rep. 442; Naylor v. Fosdick, 4 Day's Rep. 146, 250-2-6; Ashurst v. Martin, 9 Porter Rep. 566; Mackie v. Carnes, 1 Hopk. Rep. 373; Bank U. S.

v. Lee, et al. 13 Peters' Rep. 101 ; Venable v. U. S. 2 Peters' Rep. 368; Williams & Battle v. Jones, 2 Ala. Rep. 313 ; Bozeman v. Draughan, 3 Stew. Rep. 243 ; Doan v. Eddy, 16 Wend. Rep 523; Randall v. Cook, 17 Id. 53 ; Stoddard, et al. v. Butler, 20 Id. 507; Sturdevant v. Ballard, 9 John. Rep. 337 ; Statson v. Brown, 7 Cow. Rep. 732 ; Clow v. Wood, 5 Sergt. & R. Rep. 275 ; Clayton v. Anthony, 6 Rand. Rep. 285; Hobbs v. Bibb, 2 Stew. Rep. 50 ; Moore v. Ayres, Id. 336 ; Moore & P. v. Tarlton & P. 3 Ala. Rep. 444 ; P. & M. Bank v. Borland, 5 Ala. Rep. 531 ; P. & M. Bank v. Willis & Co. Id. 770.]

7. There is a prayer for both general and special relief, and this entitles the complainant to all the relief which the proof makes out, if consonant to the bill. In the present case, the proof very satisfactorily establishes, that the several conveyances by George Walker, John H. Walker and Robert Lowe, were all conceived in fraud, and that the debt of the latter to Willis & Co. has been fully paid off, and the mortgage is kept open as a mere cover for the mortgagor's property. To show that relief was authorized by the frame of the bill and prayer, he cited 8 Wend. Rep. 339 ; 1 John. Ch. Rep. 117 ; 3 Paige's Rep. 320 ; 1 Story's Eq. Plead. §§ 40 1-2 ; 2 Mason's Rep. 299 ; 1 Paige's Rep. 637 ; 12 John. Rep. 494 ; 7 Paige's Rep. 163-6 ; 4 Johns. Rep. 554.

8. The decree should not only be reversed, but it should be here rendered, giving to the complainant the relief prayed. The bill, proof, &c. shows that the cause was in a condition for a final hearing; that it was submitted to the Chancellor for that purpose, and that his decree was definitive. If this Court shall reverse it, such a decree should be here rendered as the Chancellor should have made in the cause.

T. WILLIAMS, for the defendants, insisted that the case made by the bill was substantially this, viz : that the plaintiff had recovered judgments against George Walker, John H. Walker, and Robert Lowe; that these persons had property enough to pay the judgments, but they had fraudulently conveyed the same, with intention of defeating their collection. The bill was filed after the executions had been levied, and bond and security had been given to try the right to some of the property sought to be subjected in this suit. Now, although a judgment creditor has a right to go into equity, to have his judg-

ment satisfied, yet he must proceed against the equitable funds of the debtor, and to entitle him to do this, he must alledge and prove that he has exhausted his legal remedies, without being able to obtain satisfaction. [2 Stew. Rep. 378; 4 John. Ch. Rep. 676; 2 McC. Rep. 416.] This has not been done; so far from the legal remedy being unavailable, it appears that the plaintiff is litigating with some of the defendants to his bill, whom he supposes to be fraudulent grantees, the liability of the property levied on to satisfy his executions; and it cannot be admitted that a Court of law is incompetent to try the question of fraud, as fully and effectually as a Court of Chancery. Until the levy is discharged, and the last execution issued returned "no property found," the plaintiff *upon the facts alledged*, cannot be heard in equity.

It is a rule of law, that the levy of an execution is *prima facie* a satisfaction, until it is disposed of. If the plaintiff considered the levies likely to prove unavailing, as against the claimant of the property, he could have dismissed them, and on the proper return being made, have filed his bill.

It is not contended that a creditor may not come into equity against the fraudulent grantee of his debtor, until an execution against the latter was returned "no property found;" but in the present case it is not pretended that a discovery is necessary to aid the proceedings at law, and the aspect in which the case is presented, does not show the necessity for the interposition of Chancery.

He argued that the bill and the issues at law all went to question the validity of the sales, that the proceedings at law were for the same claim or demand, and that the election of a remedy at law, under the coercion of the Circuit Court, should be enforced.

Again; the bill is defective for multifariousness, if verbosity, repetition, &c. amount to such an objection, then it is only necessary to look into the bill, to find proof demonstrative, that it is defective in this respect. For its prolixity, it should perhaps have been referred to the register, that it might have been abridged; this was not done, but the demurrer raises the question of multifariousness; and it is insisted that the bill tenders four distinct issues: 1. As to the assignment of John H. Walker to Borland. 2. The assignment of George Walker to Steele.

3. The mortgage by Lowe to A. Willis & Co. 4. The mortgage by Lowe to Pylant. [See Story's Eq. Plead. 224 5-6-7-8.]

The proof in the case was taken *ex parte*, and should not be considered as proving any thing against the defendants, who had no notice when it would be taken, and consequently did not cross-examine the witnesses. This being the case, the Chancellor should only have looked at the bill, answers and exhibits, which were admitted by the parties, and those did not make out the plaintiff's case, but went directly to defeat it.

All fraud is denied by Borland and Steele. Willis & Co. claim under a mortgage, which is still operative and in full force, although it may have been assigned to a third person; and no decree can be rendered against the validity of that mortgage, until the assignee is brought before the Court.

It is not enough, as in this case, that the bill alledges that there are no creditors of the defendants, besides the plaintiff; these should have been brought before the Court, and a decree upon the bill, without making them parties, would be erroneous. [2 Ves. Rep. 312; 18 Id. 78, 82.]

If the transfers of property which are assailed were fraudulent in the beginning, still they may become valid by the payment of a sufficient consideration afterwards, [8 Wend. Rep. 1.] Borland and Steele, by the payment of the debts of their respective grantors, acquired a good title to the property conveyed to them, without regard to the question of previous fraud. A debtor may, and sometimes ought to prefer his creditors. The Walkers have done nothing more, (4 Johns. Rep. 583,) and the lien of their assignee is unquestionable. [See 4 Cranch's Rep. 137; 1 A. K. Marsh. Rep. 110; Id. 434; 2 Murp. Rep. 242; 1 Bibb's Rep. 244; Carr v. Callaghan, 3 Litt. Rep. 337; Dev. Eq. Rep 18; Litt. Sel. Ca. 218; 2 Paige's Rep. 390; 2 Bibb's Rep. 12; Breese's Rep. 33; 1 Younge's Rep. 407; 4 Litt. Rep. 190; 5 Litt. Rep. 94; 5 Hayw. Rep. 241; 5 Monr. Rep. 408; 4 J. J. Marsh. Rep. 169; 4 Rand. Rep. 272; 1 Dess. Rep 114; 13 Wend. Rep. 240; 3 A. K. Marsh. Rep. 179; 1 Bibb's Rep. 277.] And the vendee will be entitled to a lien for advances upon a purchase set aside, although it be doubtful whether the sale was not fraudulent. [1 Vern. Rep. 465; 2 Id. 678; 2 P. Wms. Rep. 203; 2 Ves. Rep. 516; 1 John. Ch. Rep. 478.]

COLLIER, C. J.—It is laid down generally, where a plaintiff sues both at law and in equity for the same thing, the latter tribunal will compel him to elect in which Court he will proceed. But before an election will be ordered, it is said the defendant must have filed a sufficient answer, and the time for excepting elapsed. After the order is made, the plaintiff is not at liberty to proceed, either at law or in equity until he has elected; yet, if the order has been unadvisedly made, the plaintiff may move to discharge it. *Further*, it is said a plaintiff is sometimes allowed to elect specifically, that is, to proceed to a certain extent in one Court, without prejudice to his proceeding in the other Court. [1 Smith's Ch. Prac. 561-3, and cases there cited; 1 Hoffm. Ch. Prac. 342-4, and cases there cited.]

So where the plaintiff has obtained a judgment at law, and at the same time filed a bill in Chancery, on the coming in of the answer, he will be put to his election, either to proceed at law on the judgment, or in the suit in equity. [Rogers v. Vosburgh, 4 Johns. Ch. Rep. 84; Cockerell v. Cholmeley, 1 Russ. & M. Rep. 418; 3 Russ. Rep. 565; 6 Bligh. N. S. 120; Livingston v. Kane, 3 John. Ch. Rep. 22; Gibbs v. Perkinson, 4 H. & Munf. Rep 415 ]

The thirty-sixth rule, " for the regulation of the practice in Chancery," is as follows: " Where a suit at law and a bill in Chancery are instituted for the same claim or demand, the defendant, on suggestion, supported by affidavit, may move the Court to inspect the records, and if it appear that the two suits are for one and the same cause of action, it shall be ordered that the plaintiff elect in which he will proceed, and that he dismiss the other." Under this rule, the defendant, Borland, moved the Circuit Court to compel the complainant to dismiss the levy of the *pluries fi. fas.* in respect to sundry slaves embraced in the sale made by J. H. Walker to Borland, in 1840, which it is the object of the complainant's bill, among other things, to annul; or, if the defendant elected to proceed thereupon, then to dismiss his bill *pro tanto.* The complainant elected the alternative, and the Chancellor confirmed the order of election, under the impression that this Court had adjudged it to be proper. True, when the case of the Planters and Merchants' Bank of Mobile v. Borland, 5 Ala. Rep. 531, growing

out of the levy referred to, was here, the learned Judge who delivered the opinion of the Court, intimated in no equivocal terms, that the powers of a Court of law, were adequate to coerce an election by the plaintiff, where a suit for the same claim or demand, was pending there and in a Court of Equity at the same time. And the fair inference from what he said, is, that the order made by the tribunal first acting upon the subject is conclusive. Neither my brother ORMOND, nor myself, supposed, the opinion of our late respected associate went so far, as a more critical examination shows. We can only account for our misapprehension of it, when read in consultation, from the fact, that the propriety of the election was not regarded by the Court, as a material point in the cause, and whatever might have been our conclusion thereupon, would not have influenced our judgment, as will hereafter appear.

In the Planters and Merchants' Bank of Mobile v. Willis & Co., 5 Ala. Rep. 770, the same question was raised, and we then said that the regularity of the order of election was not then presented for revision. *Further*, "That order is inconclusive of the cause in Chancery, until that Court shall act upon it, and give effect to the forced election of the plaintiff. This being the case, it is not the subject of a revision by an appeal or writ of error; besides, if it were, the writ of error which has been sued out, does not complain of it, but seeks only the reversal of the judgment, on the trial of the right of property. The direction in regard to the suit in equity, could not, in the slightest degree, have affected the result of the case before us; whether right or wrong, was wholly immaterial to its decision. The reversal of the judgment, will not annul the order of election; that will still continue operative, as far as the *Court of law could make it so.*

"But the plaintiff cannot be irreparably prejudiced by the order of the Circuit Court; if erroneous, (as we incline to think it is,) it may be vacated by *mandamus*, addressed to that tribunal, or the Court of Chancery. And the latter may be required to proceed as if no election had ever been made; and this, although a decree dismissing the bill may have been rendered, under the influence of the plaintiff's election."

These remarks apply with all force to the case against Borland, and show what was there said as to the power of the Cir-

cuit Court to order an election, and the conclusiveness of such an order is a mere *obiter dictum*, and is "not a resolution or determination of the Court, or a direct solemn opinion of the judge from whom it dropped; no formed, decisive resolution, no adjudication, no professed or deliberate determination." [Ram on Legal Judgment, 37.] "An opinion given in Court, says Chief Justice Vaughan, "if not necessary to the judgment given of record, but that it might have been as well given, if no such, or a contrary opinion had been broached, is no judicial opinion, no more than a *gratis dictum*." [Ibid.]

We are satisfied with what was said in the Planters and Merchants' Bank v. Willis & Co., and from the view taken of the effect of the *dictum* in Borland's case, it results that the Chancellor was left free to exercise his judgment upon the motion to order an election. Whether the order which he made was such as the identity of the cases and their nature required, will perhaps be shown by what has been, and will be said in this opinion. It is unnecessary to be more particular upon this point, because it is clearly inferrable from the case of Willis & Co., that the propriety of the order cannot be revised upon a writ of error, which complains of the dismissal of the complainant's bill, as to all the defendants. The remedy by which the order of election as to Borland may be annulled, (if necessary,) we have seen, is a *mandamus* acting directly upon it.

In Doe ex dem. Duval's heirs v. McLoskey, 1 Ala. Rep. N. S. 708, the motion to compel an election and consequent proceeding in the Circuit Court, took place, when that tribunal exercised jurisdiction, both at law and in equity; the papers in both causes were before the Court at the same time, and an order on either side of the Court might be made effectual, (so far as appropriate,) in a cause pending on the other What was said in that cause, cannot consequently be regarded as conclusive, upon a case arising since the severance of the jurisdiction, and the assignment of law and equity to distinct judges.

2. The object of the complainant's bill, among other things, is, to set aside the sales made by George and J. H. Walker, of their property to Steele and Borland, and the mortgages executed by Lowe to Willis & Co. and Pylant, upon the allegations that the former were fraudulent in their inception, as

against creditors, and that the latter were either fraudulent when executed, or were held up with the view of delaying or defeating the creditors of the mortgagor. These allegations, unless affected by something stated in the bill, were sufficient to give to the Court jurisdiction at the suit of a creditor of a fraudulent grantor. Fraud, it is said, is a fruitful source of equity jurisdiction. Sometimes the wrong which it does, can only be repaired, and justice administered through a Court of Chancery; while in other cases it exercises a jurisdiction concurrently with law. [1 Story's Eq. chap. 6 and 7, particularly pp. 417-8-9-20-1-2; 4 Call's Rep. 253; 2 Har. & John. Rep. 487; Litt. Sel. Ca. 164; 4 Monr. Rep. 103; 4 Rand. Rep. 282; 4 Mason's Rep. 349; 1 John. Ch. Rep. 478.] When Courts of equity and law have concurrent jurisdiction of the matter in dispute, the Court which takes jurisdiction settles the matter conclusively. [2 Munf. Rep. 34; 3 Yerger's Rep. 167.] So, although property conveyed by a deed fraudulent and void, is liable under execution against the fraudulent debtor, yet equity will grant relief, by clearing away the impediment. [4 Bibb's Rep. 166.]

The levy of the execution on a part of the property embraced by the sales and mortgages in question, did not take from the complainant the right to go into equity, in order to vacate these several conveyances *in toto.* The only effect of the levies on the remedy in Chancery, would be, upon the interposition of a claim of property, to compel the plaintiff to elect, (if the matters in controversy were identical,) whether the suit should be prosecuted at law or in equity. But if this question were otherwise doubtful, it is settled by the sixth section of the act of 1828, "the better to provide for the trial of the right of property, and for other purposes." [Clay's Dig. 214.] That section is as follows: "Proceedings for the trial of the right of property, shall in no case prevent the plaintiff from going on to make his money out of other property than that levied on and claimed, if to be found; but the *supersedeas,* by appeal or writ of error, shall only apply to the property so levied on and claimed." The remedy to be pursued, to reach other property of the debtor is not pointed out; the act merely secures the right of the creditor, and he may adopt such remedy as the

119

law recognizes as appropriate, whether it be in equity or at law.

Conceding, that to entitle a judgment creditor to come into equity, to subject the equitable estate of his debtor, he should have "pursued his legal remedies to every available extent," without being able to obtain satisfaction, and still we think the equity of the bill may be supported. The bill is not framed upon the hypothesis, that the defendants in the judgment have an equitable interest in the property they have respectively transferred; but upon the assumption that the several transactions impugned, were intended " to delay, hinder and defraud creditors." If this be the true intent and purpose of the judgment debtors, they have no interest which they could assert in equity; for being *in pari delicto* with those who claim as their assignees, Chancery would not entertain a bill in their favor, but leave them to adjust as they could, the rights they set up, without lending its aid. But the right of the creditor to subject property of his debtor fraudulently conveyed, is founded in that principle of the common law, which enjoins integrity as a virtue paramount to generosity, and denounces fraud as incompatible with honesty and fair dealing. This principle is re-affirmed by our statute of frauds, which declares, that every gift, grant, or conveyance, of lands, &c. goods and chattels, &c.; and every bond, suit, &c. had or made, and contrived of malice, fraud, covin, collusion or guile, to the intent or purpose to delay, hinder, or defraud creditors, &c. shall be clearly and utterly void, &c.

If a gift, grant, or conveyance, be void as it respects creditors, it is at least competent to levy on and sell the personalty under execution, however the law may be as it regards land. But, although we have seen the creditor has this legal right, yet he is not obliged to exercise it where the debtor has embarrassed his title by making a fraudulent conveyance. Under such circumstances, he may go into equity, and ask that the conveyance may be set aside. And in such case, if the plaintiff makes out the fraud, the decree will not stop merely by annulling the deed, but it will order the sale of the property, and provide for the payment of his debt. [Garland v. Rives, 4 Rand. Rep. 282.]

The right to disembarrass the title before the property is sold to satisfy the judgment, is valuable to the creditor; if he

were compelled to sell it under execution, incumbered with a conveyance, or lien, supposed to be fraudulent, comparatively few would be inclined to purchase, and they at a depreciated price. This consideration, apart from all others, is a potent argument in favor of the jurisdiction of equity.

3. Many witnesses were examined, at the instance of the complainant, with the view of showing that the several sales and mortgages in question were fraudulent; their testimony, so far as material, may be thus condensed, viz: In September, 1840, both George and J. H. Walker were much in debt, and believed to be insolvent. In that month they both sold their entire real and personal estate; the former to his brother-in-law, David A. Steele, for a price agreed, which was to be paid in ten annual instalments. The employment of the slaves and the use of the land, &c. sold by George Walker, would pay the stipulated price, one of the witnesses says, in six years, another in seven, and others in from six to eight years. George W. has received the proceeds of wood sold from the land convey ed, though he may have accounted to Steele therefor. About the same time, J. H. Walker sold all his property to A. Borland, his father-in-law, for a price which Borland represented differently at different times; but taking the largest sum as indicating the price, it was thought that the property could be so employed as to pay for itself in from six to ten years. Borland's contract obliged him to pay some debts owing by his vendor, and the remainder of the purchase money at different periods in the future; the last of which payments had twelve years to run. Borland said his object in making the purchase was to save the property, and he thought he could make it pay for itself on the credit obtained.

In 1841, J. H. W. acted professedly as Borland's overseer. After Steele's purchase, he employed overseers on the plantation conveyed to him by G. W. Since the respective purchases, Borland and Steele have shipped the cotton crops in their names. The witnesses know of no change of property from either of the vendors—they each live where they did in 1840, have their carriages, house servants, &c. G. W. has since exercised an apparent control over the wagons employed in hauling wood from the land he sold to Steele, (to the river for sale,) as also over blacksmiths, and a shop which were embraced in his sale

to him. The Walkers, Borland and Steele, live in the neighborhood of each other, where they did in September, 1840.

In Borland v. Walker, et al. at this term, upon proof by no means more unfavorable to the plaintiff, in that case, than the evidence above recited, it was determined that the contract between J. H. Walker and Borland, was intended "to delay, hinder, or defraud" the creditors of the former, and was consequently void. Without recapitulating the reasoning there employed by the Court, we will content ourselves by referring to the opinion, and adopt it as an authority for the same conclusion in the present case.

Every argument employed to show the invalidity of Borland's purchase, applies with all force to the sale by G. Walker to Steele. There too, the contracting parties were nearly connected by affinity, lived, and still continue to live, in the same vicinity; the vendor was greatly indebted, by some persons imputed insolvent; after the sale, there was no visible, notorious change of possession: but whatever control the vendee exercised, in employing overseers, and selling the cotton crops, &c., if acts of unequivocal significance as between the parties themselves, were not such *indicia* of a renunciation of possession as would charge the creditors of the vendor with notice. *Again,* the vendor continued, long after the commencement of this suit, and perhaps still does, to occupy the house in which he resided on a part of the land conveyed; himself and family are attended by the same servants, ride in the same carriage, and use the same furniture. *Further,* he appears to direct the wagons employed in hauling wood from his land to the river, to receive money for the wood, and to use the accounts due the blacksmith's shop in paying his own debts. *To all this it may be added,* that property is sold at a price payable in ten annual instalments, which may be paid in six or eight years by the profits derivable from its employment and use; thus placing it in the power of the vendee to stipulate with the creditors of the vendor, to receive their demands on terms less favorable than by law they were entitled, rather than encounter the risk of an entire loss, or a delay, which might in many cases operate great inconvenience. This is a mere condensation of the argument, suggested by the facts. We need not amplify it; this was done

in Borland v. Walker, et al, and resting upon that case, we are constrained to conclude that the conveyance by G. Walker to Steele, tends "to delay, hinder, or defraud" the vendor's creditors, and must be set aside.

4. The mortgage from Lowe to Willis & Co., was before this Court in the Planters and Merchants' Bank of Mobile v. Willis & Co., cited above. There is nothing upon its face that indicates its invalidity, and the proof does not show that it was fraudulent *ab initio*. If the debt intended to be secured, has been paid so as to extinguish the security, then the property embraced by the mortgage is discharged from it, and if there are no liens superior to the plaintiff's the property should be subjected to the satisfaction of the judgment, sought to be collected. We express ourselves thus cautiously upon this point, because the plaintiff's counsel has furnished a brief of what he calls an answer of one of the firm of Willis & Co., in which that defendant admits the payment of the debt due the firm, but perhaps shows that it was not paid by the mortgagee, but by a third person, to whom the debt and mortgage were assigned. Now this answer is not found in the record before us, but it most probably remains in the file in the Court of Chancery. Be this as it may, we think it unnecessary to add more upon the point, than refer to the case last cited, in which we considered the rights of the creditor in connection with facts similar to those supposed to be stated in the answer.

In respect to the mortgage from Lowe to Pylant, though impugned by the bill, its validity has ceased to be a matter in controversy by the death of the mortgagee, and abatement of the suit as to him.

5. We have repeatedly had occasion to remark upon the doctrine of multifariousness, as applicable to bills in Chancery, and have heretofore shown the utter impracticability of laying down any general rules, by which with unerring certainty, it may, in all cases, be determined, whether the objection is well taken. [Kennedy's heirs & Exr's. v. Kennedy's heirs, 2 Ala. Rep. 608; Lewen v. Stone, et al. 3 Id. 490.] Mr. Justice Story says, "The conclusion to which a close survey of all the authorities will conduct us, seems to be, that there is not any positive inflexible rule, as to what, in the sense of

Courts of equity, constitutes multifariousness, which is fatal to the suit on demurrer. These Courts have always exercised a sound discretion in determining, whether the subject matters of the suit are properly joined, or not; and whether the parties, plaintiffs or defendants, are also properly joined or not." [Story's Eq. Plead. 413.]

It is said, that a demurrer for multifariousness will not be sustained, where the parties (either plaintiffs or defendants) have one common interest touching the matter of the bill, although they claim under distinct titles, and have independent interests. [Story's Eq. Plead. 120–1, 233.] Hence, it has been held, that several judgment creditors may join in one bill against their common debtor and his grantees, to remove impediments to their remedy created by the fraud of their debtor, in conveying his property to several grantees, although they take by separate conveyances, and no joint fraud in any transaction is charged against them all. In such a case, it is said, the fraud equally affects all the plaintiffs, and all the defendants are implicated in it in different degrees and proportions, and therefore are liable to be jointly sued. [Ib. 233, & notes, 409.]

*Again;* it is said, that although the defendants may not have a coextensive common interest, but their interest may be derived under different instruments, if the general object of the bill will be promoted by their being united in a single suit, the Court will not hesitate to sustain the bill against all of them. [Story's Eq. Plead. 410, and cases cited in the notes.] By a common right, or interest, we are not to understand one which is necessarily joint, it may be a right or interest which is common to, or concerns all the defendants, though perhaps in unequal degrees. [Id. 413, note 1.]

In the present case, joint judgments were recovered by the complainant against G. Walker, J. H. Walker, and Robert Lowe, all whom, it is alledged, have united in a fraudulent purpose to defeat the collection of these judgments: and to effect that end, have each made transfers of all their property. The two former, by absolute sales, professing to pass the possession and property to their respective vendees; the latter, by mortgages. All these transactions are charged to have been fraudulent, not only on the part of the defendants in the judg-

Planters & Merchants' Bank v. Walker, et al.

ment, but of their vendees and mortgagees. Here, then, it is apparent, that the three defendants last named, have a common interest in the leading object of the bill, viz: the satisfaction of the judgments, and they are charged with a joint participation in the design to defraud, which led to the supposed fraudulent transfers. This being the case, we think the authorities cited, clearly warranted the plaintiff in joining them in one suit; especially, as by thus uniting them, their rights could not be prejudiced, by subjecting them to increased costs, or protracting litigation. If several bills were filed against each of the defendants in the judgment, each of those bills would, in all probability, be almost as voluminous as one bill embracing all; and about the same number of depositions would be taken in each, as in a single suit.

As then a demurrer for multifariousness would not be sustained, for the reason merely, that the bill attacked the transfers of property made to the three defendants in the judgments, on the ground of fraud, we think the objection cannot be successfully interposed by those who claim under them, derivatively. The citations already made, sustain us in this conclusion.

6. A motion for the continuance of a cause, addresses itself to the discretion of the Court in which it is made; and however unwisely that discretion may be exercised, it cannot be revised by an appellate Court.

7. The motion to suppress the depositions, was properly overruled. When the commission issued under which they were taken, but one of the defendants had answered, and his counsel was duly notified of the time and place where the commission would be executed. The other defendants were in default, and a decree *pro confesso* had been rendered against them; this being their predicament, they cannot insist on a want of notice; but it was competent for the plaintiff to make out his case by testimony taken *ex parte*. [Clay's Dig. 351, § 39; Wilkins & Hall v. Wilkins, 4 Porter's Rep. 249.]

The defendants having afterwards answered, and the decree *pro confesso* thereupon set aside, did not authorize the rejection of the depositions or render them incompetent. If such an effect were given to the answers, then the neglect, or

caprice of the defendants might occasion expense or inconvenience to the complainant, and perhaps injury; especially, if the witnesses, or some of them, were to die or remove from the country, so that their testimony could not be taken again. The correct practice in such case, would be upon the decree *pro confesso* being set aside, for the defendants who filed answers to move upon a proper showing for leave to take the depositions of the same witnessess at the defendant's instance, and a commission could issue on such terms as would amply protect the complainant.

It is unnecessary to consider other points, suggested by the argument, or presented upon the record. The view already taken, we think, will lead to an adjustment of the matters in controversy. We have only to add, that the decree is reversed, and as we cannot know what disposition has been made of the cases of the trial of the right of property which were pending at law, we think it safer for that, if for no other reason, not to render a final decree here. The cause is therefore remanded.