Hunt *v*. Knox et al.

————◄•◦◦•►————

34 655,
72 257

DAVID HUNT *v*. AMBROSE KNOX et al.

1. PRINCIPAL AND SURETY: CONTRACT OF FORBEARANCE.—In order to discharge the surety on account of an agreement for forbearance of suit, there must be a new contract between the creditor and the principal, founded on a new and distinct consideration, extending the time of payment without the consent of the surety; whereby the creditor is bound in law not to proceed against the principal, according to the original contract, and in consequence of which the surety is debarred of his right to satisfy the original obligation, and to be sub-rogated to the rights of the creditor therein against the principal, as they stood when the contract was made. See *Newell et al.* v. *Homer*, 4 How. Miss. 684; *Wade et al.* v. *Stanton*, 5 Ib. 631; *Payne* v. *Com. Bank*, 6 S. & M. 24; *Union Bank of Tennessee* v. *Gowan*, 10 Ib. 344; *Roberts* v. *Stewart*, 31 Miss. R. 664.

2. SAME: PART PAYMENT OF A DEBT PAST DUE NOT A SUFFICIENT CONSIDERATION FOR CONTRACT OF FORBEARANCE.—The part payment of a debt, then past due, and the promise by the debtor to pay the balance in instalments, being but the partial discharge of an obligation already existing, and a mere promise to per-form what the debtor was then legally bound to do, is not a sufficient conside-ration to support a promise of forbearance of suit by the creditor; and hence, an agreement of forbearance founded on such consideration is no discharge of the surety.

3. SAME: PROMISE TO CONFESS A JUDGMENT NOT A SUFFICIENT CONSIDERATION.—An unexecuted promise by the debtor to confess a judgment as collateral secu-rity for the debt, is not a sufficient consideration to support an agreement for forbearance of suit. FISHER, J., dissented.

4. SAME: EFFECT OF STIPULATION IN CONTRACT OF FORBEARANCE THAT CREDITOR'S SECURITIES SHALL REMAIN UNIMPAIRED.—Where an agreement for forbearance of suit between the creditor and the principal debtor stipulated that all the rights of the creditor against all the parties to the securities he then held should remain unimpaired, it was held, that the agreement could not have the effect of discharging the surety, for it imposed on the principal the duty of procuring the surety's assent, and if he failed to do so, the creditor might elect to treat the contract as at an end. FISHER, J., dissented.

5. CHANCERY: JURISDICTION: WILL DECREE A SALE OF PROPERTY FRAUDULENTLY

CONVEYED.—A court of equity having taken jurisdiction, at the instance of a judgment creditor, to annul a fraudulent conveyance of his property, made by his debtor, will grant full relief to the complainant, by decreeing a sale of the property for the payment of the debt; and hence, when the complainant's judgment was valid and operative at the time of the filing of the bill, his right to relief will not be affected by reason of the Statute of Limitations, subsequently and pending the litigation, barring the issuance of a new execution on the judgment. See *Hadden* v. *Shader*, 20 John. R. 554; *Edneston* v. *Lyle*, 1 Paige, 637; *Thurmond* v. *Reese*, 1 Kelly, 449; *Trippe* v. *Lowe*, 2 Ib. 306; *Planters' and Mechanics' Bank* v. *Walker*, 7 Ala. R. 946. FISHER, J., dissented.

6. SAME: FRAUDULENT ASSIGNMENT: WHEN DEBTOR MAY PREFER CREDITORS.—A person in failing and embarrassed circumstances may prefer a creditor; but if he attempt to do so he must act *bonâ fide*, and not reserve a benefit to himself from the transaction.

7. SAME: CASE IN JUDGMENT.—A debtor in embarrassed circumstances executed a deed in trust on all his property, to secure a debt due to his brother-in-law, providing that the trustee should apply the proceeds to the payment of the debt secured, and should pay the surplus, if any, to the grantor. Afterwards he executed another deed in trust, conveying the same property, besides land not embraced in the first deed, for the purpose of securing the same debt, but reserving a support for himself and family out of the rents and profits. The trustee, by virtue of the power vested in him by the deeds, sold the property at an unusual season of the year, and for a very inadequate price, to the creditor whose debt was secured. The grantor, during the whole of the time from the execution of the first deed to the trial of the case, remained in the use and possession of the property, causing it to be assessed in his name, and paying the taxes on it. *Held*, that the conveyances were fraudulent as to creditors.

APPEAL from the Superior Court of Chancery. Hon. Charles Scott, chancellor.

The case is very fully stated in the opinion of the court; it is only necessary in addition to set out a copy of the agreement for forbearance of suit, entered into between the complainant and defendant, and to give more in detail the deposition of Mr. Marshall.

The agreement is as follows :—

"Articles of agreement, made and entered into the 5th day of February, A.D. 1850, by and between David Hunt, of the County of Jefferson, and State of Mississippi, and Andrew Knox, of the Parish of Plaquemine, and State of Louisiana : witnesseth, That the said Hunt, on the 25th day of September, 1848, recovered a judgment in the Circuit Court of Washington county, Mississippi,

against the said Knox and others, for the sum of $7725 35; and to collect said judgment, the said Hunt filed a bill in the Superior Court of Chancery, of said State of Mississippi, against Ambrose Knox and others: which judgment the said Andrew Knox is anxious to pay by instalments, and the said Hunt is willing that he should do so. It is therefore now agreed, by and between the said parties, that the said Knox shall pay the said judgment, with interest thereon at the rate of eight per centum per annum, after deducting therefrom a bill of exchange for $1500, drawn by said Knox on Payne & Harrison, and to be by them accepted, in four equal annual instalments, from the 1st day of January, 1850. If the said Knox shall pay the said instalments as they respectively fall due, either in money or by satisfactory acceptances, at twelve months, with the interest added, the said Hunt shall not attempt to coerce the payment of any further part of said judgment for the year when said instalment shall be so paid. And when all of said instalments shall be fully paid, the said judgment shall be satisfied and discharged. Should said instalments, or either of them, not be paid as above, when they become due, the said Hunt shall have full power to collect the part of said judgment then remaining unpaid, either by execution or otherwise.

" The said judgment and suit in chancery shall stand with any right or lien the said Hunt may have under either, unimpaired against any of the parties thereto, as a security for the payment of said bill of exchange, and the said several instalments. The said Knox also agrees to confess a judgment in the Circuit Court of the United States, in New Orleans, Louisiana, at some early day, for the amount of said judgment, deducting said bill of exchange, as a further collateral security for the payment of said several instalments.

" Given under our hands and seals this 5th day of February, 1850.

DAVID HUNT,

By T. A. MARSHALL, Att'y. [SEAL.]

ANDREW KNOX.                    [SEAL.]"

The deposition of Thomas A. Marshall was taken on behalf of complainant, and from that it appeared that the agreement above alluded to was entered into between the witness and Andrew Knox,

on the day of its date; that Ambrose Knox was not present when it was entered into, but that Andrew Knox stated that it would be perfectly satisfactory to him; that so far as he knew the judgment agreed to be confessed in the United States Circuit Court at New Orleans had never been confessed. Witness further states that it was the distinct understanding and agreement between himself and Andrew Knox, when said articles of agreement were entered into, that Ambrose Knox, and all the defendants to the judgment rendered in the Circuit Court of Washington county, were to remain bound thereby precisely as they were before the execution of the agreement. All the rights and remedies under that judgment, and under the bill, were to be and continue wholly unimpaired or altered in any way by that agreement, except that no further steps were to be taken in either case, provided the payments were made as stipulated in the agreement. The bill or draft on Payne & Harrison was given at the same time the agreement was entered into, and was considered and received as a payment to that extent upon the judgment.

That about the 4th of March, 1850, and as soon as he returned home from Louisiana, where said agreement was made, he wrote the following letter to Ambrose Knox, which he put in the post-office at Vicksburg, directed to said Andrew Knox, at Princeton, Washington county, Mississippi, which was then the post-office of said Ambrose.

VICKSBURG, March 4th, 1850.

MR. AMBROSE KNOX.

Dear Sir,—Your brother, Andrew Knox, and myself, have agreed upon the following terms of compromise of the case of Mr. David Hunt against him, yourself, and others. He gave an acceptance of Payne & Harrison for $1500 payable on the 1st day of January next, and he is to pay the residue in four equal annual instalments from the 1st day of January, 1850, with interest at eight per cent. per annum, that being the rate of interest which the judgment bears. The judgment and the suit in chancery against him, yourself, and others, are to stand as security for his compliance with the terms of the compromise, with whatever right or lien Mr. Hunt now has under them entirely unimpaired.

He is also to confess judgment in Louisiana. If he fails to pay either instalment when it becomes due, either in money or by giving satisfactory acceptance at twelve months, with the interest added, Mr. Hunt is to have the privilege of proceeding upon his judgment or his suit in chancery for the whole debt then remaining unpaid. To these terms of compromise I want you to write me, giving your consent and ratification of them, so far as you are concerned, as you see the judgment and suit in chancery against yourself, as well as the other parties thereto, are to remain in full force as Mr. Hunt's security for the payment of the money by your brother as agreed on.

Please write me upon the receipt of this. I am fully satisfied you would never object to the contract made by your brother, and I am convinced, also, that if he lives he will pay the money ; but as I am acting for another, and none of us have any guarantee that we will live to see this arrangement finally fulfilled, I deem it prudent to ask your written consent, &c.

Respectfully, &c.,

T. A. MARSHALL.

The above letter was handed to witness on the 24th day of March, 1854, by A. Burwell, Esq., the counsel for Ambrose Knox in this suit. Witness never received any reply to this letter, and did not see it from the time it was mailed to Knox until handed to him by Mr. Burwell.

Upon final hearing the chancellor dismissed the bill, and the complainant appealed.

*Fulton Anderson*, for appellant.

This was a bill filed by Hunt, the appellant, a judgment creditor, to subject certain property in the possession of Knox, one of the judgment debtors, to the payment of the debt.

The bill exhibits certain conveyances alleged to be fraudulent which are filed as B., C., and D., under which the property was pretended to be held, and alleges that Ambrose Knox had always been in possession.

By examination of the bill, the admissions in the answer, and the exhibits, it will be seen that Exhibit C. was a conveyance of some

seventy slaves by Ambrose Knox to his brother, Andrew Knox, to secure his brother-in-law, the defendant Davis, in the sum of about $4700, and that afterwards, in 1846, the said Andrew Knox sold the said seventy slaves and their increase for the sum of about $14,000 (see Exhibit E.), and that Ambrose Knox continued in possession after said sale, and that since that time he has paid off the $14,000 to Davis (showing the pretended purchase to have been really his own), and now owns the negroes. This transaction was of course a fraud upon creditors, and is substantially admitted to have been such by the answer, and if not a fraud still it is plain that now the property is Ambrose Knox's under the arrangement with Davis, and therefore liable to the debt of plaintiff.

Exhibit D. is another conveyance by Ambrose Knox of 960 acres of land to Blackburn to secure certain debts, but this deed contains a stipulation that out of the proceeds of the property the plantation expenses and the family expenses of Ambrose Knox were to be paid before the creditors; this deed was also a fraud, of course, and the property liable to plaintiff's debt.

But Knox, in his answer filed in 1856, sets up a defence against the judgment, and alleges that, being a surety, he is discharged from it by an agreement of the judgment creditor with Andrew Knox, the principal debtor, to give the latter time.

The deposition of Mr. Marshall puts a quietus to this defence, from his evidence, and the pretended agreement which is on file as Exhibit No. 1, to the deposition of Marshall, that it is a mere *nudum pactum.* The agreement states that Andrew Knox is desirous to pay the judgment in instalments, and that Hunt, the creditor, is willing he should do so, after deducting a bill of exchange for $1500, which Knox gave as a present payment, and which Marshall says was regarded as a payment. No new security was given for the debt, no new consideration was given for the time; but at the end of the time allowed, Andrew Knox was to do precisely what he was already bound to do by the judgment, and no more. Such a contract is clearly not binding as to the time granted, and does not, therefore, release the surety. It is true that it was agreed Andrew Knox was to confess a judgment in the Federal Court at New Orleans for the amount of the debt; but, as Marshall shows, this condition was never performed, and therefore

the hands of Hunt were not tied, and he might at any time have issued his execution. The authorities on this point are clear. There must be a valid contract upon a new and sufficient consideration, to give time to the principal, in order to discharge the surety. Mere indulgence, or a mere promise to indulge, however solemn, is not sufficient. *Payne* v. *Commercial Bank*, 6 S. & M. 24; *Montgomery* v. *Dillingham*, 3 Ib. 647; *Rupert* v. *Grant*, 6 Ib. 433; *Wadlington* v. *Gray*, 7 Ib. 522; *Govan* v. *Union Bank of Tennessee*, 10 Ib. 333; 5 How. Miss. 631.

In reference to the agreement of Knox to confess a judgment in the Federal Court in New Orleans, and his failure to do so, the above case of *Payne* v. *Com. Bank*, is expressly in point. It is also expressly decided that a payment, such as the bill of exchange for $1500, referred to in the agreement, or a promise to pay, is not a new consideration. *Payne* v. *Com. Bank*, 6 S. & M. 24.

2. But the defendant, Ambrose Knox, agreed to the arrangement, and ratified the same by his assent, and is not therefore discharged. A careful scrutiny of the evidence will, I think, demonstrate this.

Marshall says, it was the distinct understanding, when the arrangement was made, that Ambrose Knox was to assent to it, and that the judgments and securities were to stand unaffected as to all the parties. The agreement itself contains this stipulation, providing that the judgment and the proceedings which had already commenced in this case in chancery, were to stand as to Ambrose Knox. This agreement was made by Andrew Knox, the brother of Ambrose, in Louisiana, below New Orleans; and immediately after Marshall's return to Vicksburg, he wrote to Ambrose Knox, stating definitely and distinctly the terms of the contract, and that he, Ambrose Knox, was to remain bound by the judgment and under the proceedings in chancery, and requested Ambrose Knox to write and give his assent and ratification. By examination of the letter of Marshall, it will be seen that he considered Ambrose Knox bound by the agreement, and that his brother Andrew had full power so to bind him, and so stated in the letter; but desired a written ratification, because the parties might die, and the evidence thus be lost.

That Ambrose Knox received this letter, may be demonstrated

from the proof. 1. It was directed to his post-office, and it is therefore a legitimate presumption of fact that it reached its destination. This presumption is very different from those cases where the law for certain purposes requires positive proof of notice, as in the case of indorsers. Where the indorser lives, for instance, in the same town with the holder, the law requiring personal service on him does not admit of proof that the notice was deposited in the post-office, directed to him. But where the indorser lives in a different town, as the law does not require personal service of notice, but does require positive proof of notice, it allows that positive proof, to be made by the presumption of fact arising from the circumstance that the notice was deposited in the post-office, properly directed to the indorser. The analogy between the last instance and the case at bar is complete. In order to prove Ambrose Knox's ratification or assent to the agreement, it is not necessary to show that he was personally served with notice of it. It is sufficient that such a state of facts exists as will afford a reasonable presumption or inference to a court or jury that he had notice, and that presumption necessarily arises, as in the case of an indorser, from the fact that the letter was deposited in the post, properly directed, as in this case there is every probability that he did receive it. 2. But this presumption is not necessary. Suppose it did not exist, yet the proof will show that Knox did receive the letter. Marshall says that the letter was handed to him the 24th March, 1857 (the date of his deposition), by A. Burwell, Esq., the counsel of Ambrose Knox, and it is filed as Exhibit No. 2, to Marshall's deposition. It bears date March 4, 1850.

It has the seal broken, is traced to the possession of Knox's counsel, and no account of it given by him. Of course Mr. Burwell did not break the seal, as the letter was not directed to him, nor did he get it from the post-office for the same reason. No one but Ambrose Knox could have gotten it from the post-office, as it was directed to him alone. It is clear that it has not been travelling about through the post-office department for several years, since by the Acts of Congress, if not called for by Ambrose Knox, it would have gone to the dead letter office, and as it contained no valuable document, would have been burned. It bears the most conclusive marks of having been opened, read, and neatly folded

and filed away for preservation. But furthermore, the bill of complaint was filed in this case on the 7th November, 1849, subpœna was served on Ambrose Knox on the 14th November, 1849, and on the 20th day of November, 1849, Ambrose Knox filed his demurrer, and by the rules of the Chancery Court, which are made the rules of this court in chancery cases by rule , and will, therefore, of course, be taken notice of, it was the duty of Ambrose Knox to set down his demurrer for hearing within thirty days, or it would be stricken out ⸝⸝ a matter of course; and yet from November, 1849, until February, 1856, he takes no step with the demurrer, nor does he, which he might have done, have complainant's bill dismissed for want of prosecution, though no step was taken for nearly six years, at the end of which time, Andrew Knox not complying with his promises, the demurrer was overruled, and Ambrose Knox filed his answer : all these circumstances combined leave no shadow of doubt that Ambrose Knox received the letter.

If, then, he did receive the letter, he had full notice shortly after the contract that it was made to bind him as well as Andrew Knox, for it so stipulates, and Marshall so states in his letter, and yet he remains silent, says not a word, but in fact acquiesces, and receives all the benefit of the arrangement, by the delay in the proceedings. That delay was a benefit to him as well as and more than to his brother, for he was the party alone from whom collection could be made, and against whom the proceedings in chancery had been instituted.

It may be said that the object of Marshall's letter was to get his written assent, and he did not send it; but his written assent was not necessary, and was only asked by Marshall to preserve the evidence of it in case of death of parties. Marshall in fact assumes his assent in the letter, and Knox does not deny it, but all the facts show that he acquiesced in the assumption. Numerous authorities might be cited on this point, but I refer to *Cairnes & Lord* v. *Bleecker*, 12 John's Rep. 300.

But the defendant sets up the Statute of Limitations. It appears that since the commencement of the proceedings in this case, the seven years' statute has barred the issuance of execution on the judgment.

But how does that affect the equitable remedy, which is wholly

independent of the legal right. The very ground of equitable juris-diction in these cases is the want of a legal remedy. After the return of *nulla bona* the legal remedy was exhausted, and it would be absurd to require the plaintiff to continue to serve his executions and accumulate costs, when the court of equity had obtained full jurisdiction and could give ample relief. Indeed, it may be ques-tioned whether the proceèdings in equity would not suspend further proceedings at law.

This court has decided that where there are two remedies, one at law and one in equity, the bar of the legal remedy does not bar the equitable. The bar of a promissory note does not bar the remedy on a mortgage given for the same note. *Miller* v. *Helm*, 2 S. & M. 687; *Miller* v. *Trustees of Jefferson College*, 5 Ib. 651.

The position taken by counsel that in cases like this the remedy in equity is only to remove obstacles in the way of the execution, is a fallacy; the remedy is complete of itself in equity, and complete because the legal remedy is exhausted. In most of the cases where creditor's bills are filed, the object is to subject assets which are not tangible by execution at law, and where, though there is no obstacle whatever to the legal process, the property is not subject to execution, and the ground mentioned in all the cases is, that equity affords relief because the legal remedy is exhausted. 2 Dev. & Battle Ch. 138; 11 Verm. Rep. 283; 11 New Hampshire Rep. 21; 21 Maine Rep. 251; 12 Vermont, 699; 20 John. 554; 6 Paige, 273; Ib. 524; 3 Porter, 470; 1 Paige, 305; 3 Paige, 207; 4 John. 671–682.

In the case cited in 20 John. 554, it was held that the creditor filing his bill obtains a lien in equity.

In *Brown* v. *Long*, 1 Iredell Ch. 138, it was held that where judgment had been obtained, and *nulla bona* returned, the creditor was entitled to the remedy though the execution was dormant.

There cannot be a doubt that the complainant was entitled to a decree when he filed his bill, not merely to vacate the deed and let the execution run, but for a satisfaction of his debt out of the pro-perty mentioned in the bill; and it would be strange indeed that that remedy could be barred by the renewing of a statute after he filed his bill, and that too when the lapse of time, was under an agreement to which we have shown the defendant assented.

In *Myers* v. *Zanesville and Maysville Turnpike Company*, 13 Ohio Rep. 197, it was held that the creditor by filing his bill in a case of this kind, obtains a lien upon the property. *Eastland* v. *McNairy*, 10 Yerger, 310; 20 Johnson Rep. 554; see also *Work* v. *Harper*, 2 George R. 107; and *Miller* v. *McCutchen*, Ib. 65.

In the last case it was held, in a case of this kind, that there was no lien against a purchaser, because the judgment itself was not recorded so as to make it a *lien*; but it cannot be doubted, under the reasoning of the court in that case, that if the judgment had been a lien when the bill was filed, the complainant would have failed in his case.

But whether it was a lien or not makes no difference; there was a *right* to the remedy sought, when the bill was filed, and therefore it is absurd to say that that remedy can be afterwards bound by the statute pending the litigation.

As to the position taken by counsel, that the remedy must fail when the issuance of an execution is barred after filing the bill, see also 7 Paige, 149, where it was held that where a judgment was obtained and *nulla bona* returned, the creditor could file his bill without bringing an action on his judgment in another county, to subject property not subject to the jurisdiction of the court in which the judgment was obtained.

*A. Burwell*, for appellee.

The bill in this case was filed 7th Nov., 1849, and sets out that Hunt had recovered judgment against Andrew Knox, as principal or maker of a promissory note, and against Ambrose Knox as security, or accommodation indorser. This judgment was rendered, in 1848, in the Circuit Court of Washington county. The bill alleges that certain conveyances of Ambrose Knox were fraudulent, being to Davis, his brother-in-law, to secure pretended debts and liabilities in his (Davis's) favor. This so encumbers the property that it cannot be sold for a fair price, and complainant prays that the deeds may be cancelled, and this obstacle in the way of complainant removed. The answer denies all fraud, and there is no proof to sustain that charge. The answer states that all the debts to Davis have been long since paid, and the notes are produced and filed, showing this statement to be true.

The answer sets up that, without the knowledge or consent of defendant, the complainant, about January, 1850, made a compromise and agreement with Andrew Knox, by which Hunt agreed to receive, and did receive, certain payments then made by Andrew, and certain bills and sureties, and agreed to hold up, and did hold up, the claim for several years, and until the death of Andrew Knox, which occurred in the year 1856. See agreement of compromise, and receipts for several payments.

The answer sets up and relies on this arrangement with the principal as a release and discharge of the surety.

The answer relies on the Statute of Limitations. The judgment having been rendered more than seven years, and no execution having issued within seven years, a motion was made in the Circuit Court of Washington county to quash an execution which the complainant issued. The Circuit Court, on argument of counsel on both sides, sustained the motion, and quashed the execution, on the ground that the judgment was barred by the statute.

The deposition of Mr. Marshall has been taken, and that proves the agreement and various exhibits to the answer. Mr. Marshall proves that Ambrose Knox knew nothing about the compromise, and was no party to it; for in his letter to Mr. Knox, long after the compromise, he informs Mr. Knox of it, and asks him to ratify it. This Mr. Knox did not do, and has never to this day done.

1. Knox was released from all liability, being security, by the compromise with the principal. He could not proceed to collect, because Hunt, the creditor, had, for a valuable consideration paid him, tied up his claim, and it would have been a gross fraud upon Andrew Knox for Hunt to violate the agreement, and proceed to collect the debt. Hunt did receive sundry payments from Andrew Knox, performing his contract as he was bound in good conscience to do.

No principle is better settled than that, the benefit of which is claimed for Knox in this case.

2. The judgment is barred by the statute. The Circuit Court has adjudged that. Hunt applied to the Circuit Court, and that court had jurisdiction, and its judgment is final and conclusive.

But the judgment of the Circuit Court was clearly right. The point has been settled by the High Court in various cases.

3. This court is now asked to declare void certain deeds for fraud, and to remove obstacles out of the complainant's way. For what purpose? In order that the plaintiff may levy his execution and sell property at a fair price. What execution does complainant wish to have levied? Why, one that is barred by statute, and that has been quashed. The powers of a court of chancery are very large and ample, but they do not extend so far as to give life to a dead judgment or execution.

The filing of a bill does not stop the running of the statute. An injunction does not have that operation, as was decided in *Robertson* v. *Alford*, 13 S. & M. 510. A court of chancery does not give the party a legal right, but aids him to enforce his legal rights. If pending a bill in aid of a judgment at law, the plaintiff suffers his judgment to become barred, or to be satisfied by any action of the court in which it was rendered, it does seem to me very clear that he can have no remedy as to that judgment in a court of chancery. That would be in fact to give him a new and valid judgment, in place of his barred or satisfied judgment, which this court has no right to do.

4. It may be said that Marshall's letter informed Knox of the arrangement, and that Knox never disaffirmed it. The answer to this is conclusive, it seems to me. Mr. Marshall informed Knox that he, as agent of Hunt, had made an arrangement with Andrew, the legal and equitable effect of which was to release Knox from all liability. Knox would have been a very stupid man, I might say a fool, if he had made any reply. He never assented, and from that day until a few months past, Knox heard nothing more of the matter, until, after the death of Andrew, the contract was found among his papers, and then Hunt waked up to the importance of doing something, and, striking boldly but blindly, issued his execution, which the Circuit Court disposed of as before stated.

Mr. Marshall in his letter says he wants Ambrose Knox's consent, in writing, to the arrangement. Knox never gave it. Knox was released on the instant that the contract was executed. Even if Knox had written that he would consent to be bound, and would not be released, it would have been a *nudum pactum*, without consideration and void. The distinction is between a consent or agreement made at the time, and constituting an inducement to the contract, and one made afterwards. The first is binding without

consideration; the latter requires a consideration to support it. This was fully settled in *Crowder* v. *Dick*, 2 Cushm. (Miss.) 39, and 10 S. & M. 71.

But it seems to me, that a simpler view of the case is even more conclusive. Knox was released by the contract and by the acts of the parties, unless his consent is proved. The answer denies such consent, and there is no proof, except the request to give the consent, which request was not complied with.

*Yerger* and *Rucks*, on same side.

The appellant, on the 7th day of November, 1849, filed his bill of complaint in the Superior Court of Chancery against Ambrose Knox and others. The bill was filed to set aside certain deeds of trust and conveyance made of his property by Ambrose Knox, and to subject the same to the payment of a judgment, which David Hunt had recovered on the 25th day of September, 1848, against Andrew Knox and others in the Circuit Court of Washington county, for the sum of $7725 36, upon which judgment, execution had issued on the 20th day of November, 1848, directed to the sheriff of Washington county, and had been by him returned *nulla bona*. On the 29th day of November, 1849, Ambrose Knox demurred to the bill of complaint, which demurrer was, on the 14th day of February, 1856, overruled, and time given Ambrose Knox to answer. His answer was filed on the 3d day of June, 1856; in this answer the defendant sets forth the fact that he was only an accommodation indorser upon the note upon which David Hunt recovered judgment against Ambrose Knox and others in the Circuit Court of Washington county, also the various debts to secure which the deeds of trust (sought to be set aside by complainant's bill) were executed, and also an agreement entered into by Hunt and Andrew Knox on the 5th day of February, 1850, filed with the answer as Exhibit No. 1, by which agreement Ambrose Knox contended that he was released from the judgment aforesaid. The answer further relies on the Statute of Limitations as a bar to the complainant's bill. Upon the trial of the cause the bill of complaint was dismissed by the chancellor, from which judgment an appeal is taken to this court.

The judgment of the court below should be sustained for the following reasons:—

First. The agreement which was entered into on the 5th day of February, 1850, between David Hunt, the judgment creditor, and Andrew Knox, the principal in the judgment, was a discharge as to the other parties. This agreement was made in the State of Louisiana, in which State Andrew Knox resided; by it, it was stipulated and agreed between the parties that Andrew Knox should pay $1500 of said judgment on that day by an acceptance, and should pay the balance of said judgment in four equal annual instalments; and it was agreed "If the said Knox shall pay the said instalments as they respectively fall due, either in money or by satisfactory acceptances at twelve months, with the interest added, the said Hunt shall not attempt to coerce the payment of any other part of said judgment for the year when said instalment shall be so paid," and further, "The said Knox also agrees to confess a judgment in the Circuit Court of the United States in New Orleans, Louisiana, at some early day, for the amount of said judgment, after deducting said bill of exchange as a further collateral security for the payment of said instalments." A reference to this agreement will satisfy the court that Hunt received a considerable payment upon the judgment, from the principal judgment debtor, at the time it was entered into, and that by it he was also to receive additional security for his debt, to wit, the confession of judgment by Andrew Knox, for the amount which was still due to him, in the United States Court in Louisiana, in which State Knox resided. This agreement was entered into without the consent of Ambrose Knox. By it Hunt received the acceptance of Payne & Harrison, payable 1st January, 1851, for fifteen hundred dollars of his debt, and extended the payment of the residue to four equal annual payments, and bound himself, upon the payment of the instalments, not to attempt to collect the balance of the judgments. According to the agreement, payments were made to Hunt of the instalments for the years 1851 and 1852.

By this agreement Hunt gave a new credit to the principal debtor, extended the time of payment to annual instalments, took additional collateral security for his debt, and tied his hands so that he could not proceed against the principal judgment debtor. It is clear that by this the sureties were discharged. *Rupert* v. *Grant*, 6 S. & M. 443.

But further, in a case like the present, when time had been given to the principal debtor without the consent of the surety, all proceedings in the cause suspended for years, several payments having been made by the principal debtor in pursuance of the new agreement entered into between him and the creditor, and at length, after the lapse of years, when the principal debtor had died insolvent, and after such delay and negligence on the part of the complainant, surely a court of equity would not lend its aid to compel a surety to pay under such circumstances. The rule of equity is, that it only lends its aid and assistance to those who are vigilant in ascertaining and protecting their rights.

Secondly, the Statute of Limitations, Hutch Code, 831, is an effectual bar to the bill of complainant. By this statute it is provided that, "nor shall any person sue out an execution on any judgment or decree after seven years from the time the last execution issued on such judgment or decree." On the judgment on which the bill of complaint is founded, execution issued on the 20th day of November, 1848; after which no execution was issued until the 15th day of December, 1855; which execution was, upon motion before the Circuit Court of Washington county, on the 6th day of May, 1856, quashed. This was in accordance with the ruling of this court in the case of *Vick* v. *Chewning*, 2 George R. 201.

The judgment upon which the bill of complaint is filed being barred by the Statute of Limitations, of course the chancellor was right in ordering the bill filed to enforce the collection of the same to be dismissed, as the bill was filed to remove incumbrances from the property which prevented an execution at law from being levied upon the same. It would be useless for the chancellor to determine whether the same were valid or not, when the judgment itself is barred, and no execution can issue upon the same.

HANDY, J., delivered the opinion of the court.

This bill was filed in the Superior Court of Chancery, on the 7th November, 1849, by the appellant, alleging that on the 25th September, 1848, he had recovered a judgment at law against Andrew Knox and Ambrose Knox, for the sum of $7725 36, with interest and costs, and that an execution, issued thereon, had been returned by the sheriff "*nulla bona.*" The bill charges that the

defendant had made several conveyances fraudulently and for the purpose of hindering and delaying his creditors; in consequence of which his property could not be fairly subjected to the satisfaction of the appellant's judgment, and the judgment remained unsatisfied. The particulars of the alleged fraudulent arrangements are fully stated, and the defendants required to answer; and the bill prays that an account be taken of the amount due upon the judgment, that the alleged fraudulent deeds be set aside, and that the property of the defendant, Ambrose Knox, be decreed to be sold for the payment of the amount found due the complainant.

At the return time of the process, Ambrose Knox filed a demurrer to the bill, which appears to have remained undisposed of until February, 1856, when it was disallowed, and an answer required; and on the 3d June, 1856, he filed his answer, denying that the deeds mentioned in the bill were executed for the fraudulent purpose therein charged, and alleging that they were made for the purpose of preferring certain creditors, and undertaking to explain them.

The answer further sets up, as a ground of defence, that the respondent, Ambrose Knox, was merely a surety for Andrew Knox, in the judgment sought to be enforced; and alleges that on the 5th February, 1850, certain articles of agreement were entered into between the complainant and Andrew Knox, by which it was agreed, that Andrew Knox should pay the judgment, with interest, in four equal annual instalments (after deducting a bill of exchange for $1500, drawn by Andrew Knox on Payne and Harrison, and by them to be accepted), from the 1st January, 1850; and that if the said instalments should be paid as they became due, the residue of the judgment should not be attempted to be coerced; and when all of the instalments should be paid, the judgment was to be entered satisfied. And the answer alleges that, in addition to the draft for $1500, received by the complainant, Andrew Knox drew his draft, on the 1st January, 1851, on Payne & Harrison, for $1680 84, in part payment of the judgment, which was accepted and paid, and by means thereof further time was given to Andrew Knox to pay the residue of the judgment, and that in like manner the sum of $1590 was paid by accepted drafts, drawn by Andrew Knox, on the 13th June, 1853. The answer charges that this time of

payment was given to Andrew Knox, without the knowledge or consent of the respondent, his surety, and that he is thereby discharged.

The agreement referred to in the answer, and made an exhibit to it, is signed by the complainant, through his attorney, and by Andrew Knox. After reciting the judgment at law, and that the complainant had filed this bill to enforce it, and that Andrew Knox was willing to pay it by instalments, to which the complainant acceded, it states, that the parties had agreed that Knox should pay the judgment with interest (after deducting therefrom a bill of exchange for $1500, drawn by him on Payne & Harrison, and to be by them accepted), in four equal annual instalments, from the 1st January, 1850; and, if Knox should pay the instalments as they respectively fall due, either by money or satisfactory acceptances, &c., that complainant should not attempt to coerce the payment of any further part of the judgment, for the year when such instalment should be so paid; and when all of the instalments should be fully paid, that the judgment should be satisfied; and should any of said instalments not be paid when they became due, that the complainant should have power to collect the part of the judgment then remaining due, by execution or otherwise; the judgment and this suit in chancery to stand, with any right or lien existing under either of them, unimpaired against any of the parties thereto, as a security for the bill of exchange and for the instalments. It was further agreed, that Knox should confess a judgment in the Circuit Court of the United States at New Orleans, at some early day thereafter, for the amount of the judgment, after deducting the bill of exchange, as a further collateral security for the payment of the several instalments.

The only testimony in the cause is that of Thomas A. Marshall, Esq., who made the agreement, as attorney for the complainant, with Andrew Knox. He states that Ambrose Knox was not present when the agreement was entered into, it being made by deponent and Andrew Knox; that deponent shortly afterwards wrote to Ambrose Knox, advising him of it, and desiring his consent to it in writing, to which application he never received an answer; that the drafts of 1st January, 1851, and 13th June, 1853, mentioned in the answer of respondent, were received and paid, but that no

confession of judgment in New Orleans was made, to his knowledge; that the draft on Payne & Harrison for $1500 was given at the time the agreement was made, as he thinks, and was received as a payment to that extent upon the judgment.

Upon the hearing, the bill was dismissed, and from that decree this appeal was taken.

The first question for consideration is, whether the agreement made between the appellant, through his attorney, and Andrew Knox, the principal debtor, had the effect to discharge the appellee, his surety, by giving time of payment without the consent of the surety.

The principles involved in this inquiry have been the subject of frequent adjudication in this court, and the rules governing it are as well settled as any branch of the law. The only doubt that can arise in such cases is, with regard to the facts, and whether the particular acts of the creditor amount in law to a new and valid agreement, upon a new and sufficient consideration, to give time to the principal, without the knowledge or consent of the surety. The rule is firmly settled, that in order to cause the discharge of the surety, there must be a new contract between the creditor and the principal, founded upon a new and distinct consideration, extending the time of payment, or otherwise varying the terms of the original obligation to the surety's prejudice, and without his consent, whereby the creditor is bound in law not to proceed against the principal, according to the original obligation; and in consequence of which contract the surety is debarred of the right, to satisfy the obligation which he contracted, and to be subrogated to the creditor's rights against the principal, as they stood by the terms of the original contract. *Newell & Pierce* v. *Hamer,* 4 How. Miss. 684; *Wade et al.* v. *Stanton,* 5 Ib. 631; *Payne* v. *Commercial Bank,* 6 S. & M. 24; *Union Bank of Tennessee* v. *Govan,* 10 Ib. 344; *Roberts* v. *Stewart,* 31 Miss. 664.

In the present case, there is no question but that the agreement for indulgence in paying the judgment, was made by the appellant with the principal debtor; and there being no sufficient evidence to show that this was done with the knowledge or consent of the surety, it must be regarded as having been done without his consent. But it is insisted, in behalf of the appellant, that the agree-

ment was not binding in law upon the appellant, because it was not made upon any new and distinct consideration, sufficient in law; but that the consideration, so far as it was executed, was but the performance of what the debtor was already bound to do, and the creditor got nothing which he was not entitled to, without the agreement; and hence, that the arrangement is wanting in an essential feature to make it binding—a new and independent consideration.    Let us examine the transaction with reference to this view.

The arrangement made between the parties was simply this. Andrew Knox proposed to pay the judgment which Hunt held against him, by instalments, paying fifteen hundred dollars, in part of the judgment, at the time, by an acceptance of third persons for that sum, and paying the residue of the judgment in four equal annual instalments; and upon his prompt payment of each instalment, execution was to be stayed for the residue of the judgment until the next instalment became due, and so on until the whole judgment was paid; but in default of payment of any of the instalments, the balance of the judgment then due should be collected by execution, or otherwise.    These terms were accepted, and the agreement was accordingly made by Hunt, and Knox paid the sum of fifteen hundred dollars by an accepted draft at the time, and subsequently paid two of the instalments by accepted drafts.    It was also further agreed, as part of the transaction, that the judgment and the suit in chancery should remain unimpaired as to Hunt's rights against all the parties thereto, as a security, and that Knox should confess a judgment at an early day in New Orleans, for the balance due on the judgment, as a further collateral security for the instalments.    But the judgment was not confessed, and if the defence set up by the answer be true, Andrew Knox failed to take the proper steps to preserve unimpaired the rights of the creditor upon his judgment, by obtaining the consent of his surety to it.

The consideration for the agreement, therefore, rests upon the acceptance for fifteen hundred dollars paid at the time, and the two instalments of the debt subsequently paid.    And it is clear that those payments do not constitute a new and distinct legal consideration for the agreement.    They were made as instalments and part payment of the debt already due, and which Knox was bound

to pay, apart from the agreement; and the agreement imposed no further obligation upon him than he was already under, and conferred no benefit upon the creditor which he was not entitled to under his judgment. *Montgomery* v. *Dillingham*, 3 S. & M. 660; *Roberts* v. *Stewart*, 31 Miss. 664. When the payments were made, they passed as credits upon the judgment, just as they would have been if the agreement had not been made.       *

It does not appear that any benefit was derived to the appellant from the mode in which the payments were made, that is, by means of accepted drafts. The acceptances were given, not as a new security, with any additional benefit to the creditor, but as a mode of payment which, it is to be presumed, was specified for the convenience of the debtor; for the acceptance given when the agreement was made, was given as a payment, and the right to pay the instalments thereafter, either in money or acceptances, was expressly reserved to the debtor. It is, therefore, to be presumed that in making the payments he adopted the mode most convenient to himself, and did not act with a view of giving an advantage to his creditor greater than he would have had by the payment of actual money.

In legal effect, therefore, the agreement is nothing more than a gratuitous promise by the creditor that he will give his debtor time to pay his debt, and will not coerce him by law, if he will pay it by instalments at certain specified times. According to the principles held in the cases above cited, and indeed in the entire current of authorities, this is not such a binding contract in law, as will tie up the creditor's hands and prevent him from proceeding upon his demand against his debtor as it stood before the agreement was made. The creditor might have proceeded upon his original claim, notwithstanding the agreement; and consequently, Ambrose Knox had the right to go forward and pay the debt and be subrogated to the rights of the creditor against his principal, which were unaffected by the agreement.

There is another view of this agreement which shows that Andrew Knox could not have set it up as a binding contract, staying execution, in case Hunt had thought fit to proceed upon his judgment.

It was made by Andrew Knox, as this defence alleges, without the privity or consent of his surety, and he stipulated that the judg-

ment and this suit, with all rights under them, should remain unimpaired against all the parties thereto, as a security for the first bill of exchange and the instalments.    This was an important stipulation for the protection of the creditor's rights; and it was the duty of Andrew Knox to see that it was carried out; and that could only be done by obtaining the concurrence of his surety in it, he being a party to the judgment.    If the defence here relied on be true, he failed to do so; and hence an important stipulation in the agreement failed.    Hunt, therefore, had the right to refuse to carry out the agreement on his part, because a material part of it had not been complied with, and a valuable security was likely to be lost to him.    If the agreement had been made upon a sufficient consideration in other respects, he had the right to treat it as at an end, by reason of the failure of consideration in a matter most material to his interest, and to proceed with his judgment or suit in equity as if the agreement had not been made.    And this appears to be a decisive objection against the binding character of the agreement.

Nor was the agreement to confess a judgment, a sufficient consideration to make it a binding contract.    It was executory, and was never performed.    Being founded on no sufficient legal consideration executed, it was within the power of Hunt to disregard and abandon it, at any time before the judgment was confessed.

We are of opinion, therefore, that the agreement in this case and the acts of the parties under it, do not operate in law to release the surety, and that the decree cannot be maintained on that ground.

The next question is, whether the relief sought by the bill is barred by the Statute of Limitations.

It appears by an exhibit to the answer of the appellee, that a period of more than seven years had elapsed since the date of the issuance of the first execution, and before the issuance of a second execution, upon the appellant's judgment.    It is, therefore, contended in behalf of the appellee, that although this bill was filed before the judgment was barred, yet the complainant could have no further relief under it, than to have the alleged fraudulent conveyances set aside, to the end that his execution at law might be levied of the property fraudulently conveyed, with the fraudulent obstructions removed; and, inasmuch as the execution is barred, that the relief which can only have reference to the execution at law, and is

in aid of it, is also barred; and that the bill was therefore properly dismissed.

The record shows, that while the complainant's judgment was in full force, he filed this bill for the purpose of subjecting the property of the defendant in the judgment, to the payment of his debt; alleging that it was fraudulently conveyed, so that it could not be fairly subjected to an execution at law; praying an account of the amount due on the judgment, and a decree for the sale of the property for its payment.

We do not agree with the position taken in behalf of the appellee, that a judgment creditor whose execution is obstructed by means of fraudulent conveyances, can have no further relief in equity than to have the conveyances set aside, and that he must then proceed at law for the execution of his judgment.   It is true, that this is the extent of the relief most usually granted in such cases in equity, the reason of which is, that generally it is all that is necessary.   But it cannot be questioned that a court of equity has jurisdiction of cases of fraudulent conveyance of property, and though it is concurrent with a court of law, it is much more competent, by reason of its peculiar mode of proceeding, to administer full relief in such cases, than a court of law.   It is a familiar principle, that when courts have concurrent jurisdiction, the court which takes jurisdiction of the subject-matter, settles it conclusively, and renders complete justice.   Upon principle, therefore, no reason is perceived why a court of equity, having taken jurisdiction, at the instance of a judgment creditor, to annul fraudulent conveyances of property, should not grant full relief to the defrauded creditor, by decreeing a sale of the property for the payment of the debt.   And this course is well sanctioned by precedent.   *Hadden* v. *Spader*, 20 John. Rep. 554; *Edmeston* v. *Lyle*, 1 Paige, 637; *Thurmond* v. *Reese*, 3 Kelly, 449; *Trippe* v. *Lowe*, 2 Ib., 306; *Planters' & Mec. Bank* v. *Walker*, 7 Ala. 946.   In *Edmeston* v. *Lyle*, Chancellor Walworth says, " The principle being established that every species of property belonging to the debtor may be reached and applied to the satisfaction of his debts, the powers of a court of equity are perfectly adequate to carry that principle into effect."   641.   It is also supported by considerations of justice and right; for otherwise, a junior judgment creditor might bear the en-

tire trouble and expense of an arduous litigation to annul a fraudulent conveyance, and after he had been successful, the entire property of the defendant might be absorbed by senior judgments, whose owners had borne no part of the trouble or expense of the litigation, and who at law would be entitled to the avails.

But in addition to this, there are plain considerations of equity in this case which call for the relief prayed for in the bill.

The bill was rendered necessary by the alleged fraudulent acts of the appellee. The complainant pursued the only remedy which could afford him adequate relief, in due season, and whilst his judgment was in full force, and would have been satisfied but for the alleged fraudulent acts of his debtor. Before the controversy is terminated, the remedy at law is gone, not by any *laches* of the creditor, but in consequence of the unconscientious conduct of the defendant, which prevented the enforcement of the execution at law. These circumstances, instead of showing that the creditor should be debarred of all relief in equity because his remedy at law would be barred, furnish a strong reason why equity should grant relief, if it can be done consistently with the powers of that court. His claim is just, and having been prevented from enforcing it by the conduct of the defendant, he has proceeded in the only court where he could obtain adequate relief, in due time. His claim to relief is to be referred to his right, at the time of filing his bill, and if it was well founded and in full force at that time, but his legal right has become barred by lapse of time, during the pendency of the bill, the very fact that he would be without remedy at law, entitles him to relief in equity.

We, therefore, think that the defence of the Statute of Limitations is not available, and that the decree cannot be justified on that ground.

It only remains to inquire whether the conveyances mentioned in the bill are to be held as fraudulent in law as to the creditors of Ambrose Knox.

The bill alleges, in substance, that in September, 1840, Ambrose Knox conveyed to his brother, Andrew Knox, about seventy slaves in trust and for the alleged purpose of securing to one Davis, his brother-in-law, the sum of $6377 84, stated to be due him, and to indemnify him as surety for Ambrose Knox to the amount of

$4720. The trustee was, by the terms of the deed, to hold and keep the slaves for the purposes specified, and upon failure of Ambrose Knox to pay the debts mentioned punctually, to sell the slaves to pay the debts and expenses, and to pay the surplus to Ambrose Knox; that in January, 1841, he executed a deed, conveying to one Blackburn, in trust, a tract of nine hundred and sixty acres of land, and all the slaves mentioned in the previous deed, and horses, mules, stock, farming utensils, carriages, tools, provender, and crops of cotton and corn; the trustee being required to take immediate possession of the property, and to receive the profits of it, and to apply the proceeds, 1st, to the payment of all expenses; 2d, to pay the necessary family expenses of the grantor; and 3d, to pay certain specified debts, including the debt to Davis embraced in the previous deed; that in August, 1846, Andrew Knox, under color of the first deed, sold the slaves therein mentioned, with their increase, about seventy-two in number, to Davis, for the sum of $14,417, and conveyed the same to him. The bill charges that these conveyances were colorable, and. intended to hinder and defraud the creditors of Ambrose Knox, and especially the complainant; that, although not authorized to do so by the terms of the deeds, Ambrose Knox retained possession and had the use and benefit of the land, slaves, and all the other property, from the date of the deeds to the time of filing the bill, as he did before the deeds were made; that the deeds are fraudulent upon their face, reserving a benefit to the grantor and his family, especially that to Blackburn; that when the pretended sale was made by Andrew Knox to Davis, the latter was not present, and has not been in this State since; and at the time of the sale, that Ambrose Knox was indebted but little, if anything, to him; that after the sale, the slaves were not delivered to Davis, but remained on the plantation of Ambrose Knox, under his exclusive control, and have been since assessed as his property, and the taxes accordingly paid by him; that the prices at which they were sold to Davis were pretended, and grossly inadequate; and the sale was made at a most unusual season of the year for such sales, in the month of August, on the plantation, without the knowledge of the complainant or other creditors.

The answer of Ambrose Knox admits that he has continued in

the possession of the property, that Davis lived in the State of North Carolina, and that the respondent continued in possession by his consent. By way of justification of the deeds, he states that he was deeply in debt at the time of their execution, and that the deeds were made for the purpose of securing the debts therein specified as preferred debts, and reserving a support to himself out of the property, his intention being to appropriate the proceeds of his property, first, to the payment of the preferred creditors, and secondly, to his creditors at large ; and he denies any fraudulent intent. He states that the sale was made by Andrew Knox to Davis for the purpose of more effectually securing Davis, and that, after the purchase, Davis agreed that he should have the right to redeem the property by paying the purchase-money and the sum of $2300 loaned to him by Davis subsequent to the date of the deed of trust ; and he has subsequently redeemed the property. He further states that under the trust deed to Blackburn, all the proceeds of the crops, except a support, have been applied to the payment of the debts therein mentioned.

It is apparent that the answer is silent as to several of the most material allegations of the bill showing the evidences of fraud ; such as, that the sale to Davis was made for a grossly inadequate price, that it was made at a most unusual season of the year, during the midst of the cultivation of the crop ; that Ambrose Knox remained in possession during the whole time after the execution of the deeds, treating the property as his own, as before the execution of the deeds, having it assessed as his property and paying the taxes ; that he was indebted to Davis but little or nothing at the time of the sale, and that the slaves were not delivered to Davis after the sale. But the possession of the property, which is inconsistent with the deeds, and the use of it for his support, are admitted ; the first deed provides that the surplus, after paying a comparatively small amount, shall be paid to the grantor, and the deed to Blackburn expressly reserves the benefit, of having his family expenses paid by means of the property, before the proceeds of it were to be applied even to the specified debts.

Besides the other circumstances appearing by the record, and tending to show that the deeds and proceedings under them were fraudulent, as to the creditors of the appellee, the reservation of

the surplus to his own use in the first deed, and of a benefit to him and his family in the deed to Blackburn, his continuance in possession of the property inconsistently with the terms of both deeds, and his enjoyment of the use and benefit of it for his support, which facts are admitted, are sufficient, upon well-established rules, to condemn the conveyances. And it is no answer to such objections, that the deeds were made for the purpose of preferring creditors; for though a party in failing or embarrassed circumstances may prefer a creditor, he cannot reserve a benefit to himself in the transaction, because that would enable any debtor to retain his property to his own use, under pretence of conveying it for the benefit of his creditor. The facts appearing in this case, therefore, clearly show that the conveyances mentioned in the bill must be declared void as to the complainant.

It follows from the views of the case, that the decree is erroneous and must be reversed.

But as the defendant Davis was not made a party to the suit by service of process or by publication, and no appearance was entered for him, the decree which would follow from the foregoing views cannot be rendered, and the cause must be remanded for further proceedings after notice given to the defendant Davis.

Fisher, J., delivered the following dissenting opinion.

Having arrived at a conclusion in this case different from that resulting in the opinion of the majority of the court, the law requires the reasons for such conclusion to be stated.

The facts, as stated by the majority of the court, may, as to all substantial matters, be conceded. The statement is, perhaps, not sufficiently comprehensive in my view to present the case in its true light, as to the point relating to the decree; but as this is not material to the main point which I propose to consider, I will not at present attempt to enlarge the statement made by the court.

The first point to be considered is, whether the agreement entered into on the 5th of February, 1850, between Hunt, the creditor, and Andrew Knox, the principal debtor, was so far binding upon the parties as to have the effect of releasing Ambrose Knox, the indorser of the note upon which the judgment was recovered. It will be borne in mind that, by the terms of this agreement, Andrew

Knox was permitted to pay the judgment in four equal annual instalments, and that Ambrose Knox was not a party to this arrangement.

The first question is, was there a sufficient consideration for the agreement? I respond in the affirmative to this question. The judgment being of record in the Circuit Court of Washington county, Knox was only bound to pay there, where the proper entry of satisfaction could be made upon the record. By the new arrangement, he either undertook to pay in Louisiana, where the contract was made, or, if this be not so, to seek his creditor, and make payment wherever he might be found; and, in either view, this was to some extent a modification of the liability imposed by the judgment, because the debtor assumed upon himself the trouble incident to this new mode of making payment, and trouble, loss, or inconvenience may be a sufficient consideration for a contract, and this principle being found in all the elementary books on this subject, I will not cite authority to sustain it.

Again, Knox was, by the terms of the contract, to confess a judgment at an early day in the Circuit Court of the United States for Louisiana, as a collateral security for the balance due upon the judgment. By this part of the agreement he assumed upon himself the trouble and expense of attending court, besides the costs incidental to the proceedings in court. Here was not only additional trouble, but additional pecuniary responsibility imposed, and both imposed for the benefit of the creditor; because the object of the judgment was to create a lien upon the debtor's property in the State of Louisiana, and in this way to create a new security for the debt. Or if there was no property to which a lien could attach, it would make no difference, as the creditor agreed to subject himself to the rules of a new jurisdiction, whose laws might even restrain him of his liberty if he failed to make payment. He agreed to concede to the creditor such additional power over him, the debtor, as the laws of Louisiana would confer in virtue of the judgment; and whether it be, in point of fact, a new security, or an additional remedy, or worth but little to the creditor as either, it was something, to which the parties attached value at the time; and the courts, in pronouncing upon the action of the parties themselves, have no right to set their judgment aside, unless it shall

appear that they acted in some manner contrary to the restraints imposed upon their action by the law; for the question in such case is not what the law grants, but what it restrains; and hence, the parties having determined that such a thing was of value to one of them, before a court can determine otherwise, it must appear that the parties were restrained by the law from exercising their judgments in this particular.

Having viewed the consideration moving from Knox to Hunt, I propose noticing the consideration moving from Hunt to Knox; and, viewed in this light, I submit that the case is perfectly conclusive. I presume if Hunt had sued Knox upon any one of the instalments, supposing him to have been in default, no difficulty would have existed as to recovering a judgment. I take it for granted, upon plain principles of reason, law, and common justice, that he could not have resisted a recovery against him. The fact that Hunt had, at the request of Knox, divided the judgment, I may say into five instalments, and had entered into an agreement to receive payment in this way, that in addition to this he had not only suspended his legal and equitable remedies to enforce his judgment, but had virtually abandoned these remedies, would certainly be held a sufficient consideration to bind Knox to Hunt.

Now, if it be true that Knox was bound, the law favoring reciprocity in all contracts, Hunt would also be bound. The promise of one, was the consideration for the promise of the other, and hence one could not be bound without the other being equally bound; and if both were bound, then there was a contract, fully consummated on the day it was entered into between the parties.

It is, however, said, that Andrew Knox undertook to procure the consent of Ambrose Knox to the arrangement, and failing to do so, the contract was never completed. In the first place, the court are mistaken as to the fact that Andrew Knox undertook to procure this consent; for Mr. Marshall, Hunt's agent, who transacted the business, says that he undertook to perform this duty, and no doubt supposed that he had done so, but he has failed to show that the indorser's consent was obtained. There is, therefore, no reason for holding that Andrew Knox undertook to perform this duty. But I am willing to admit, for the purposes of this case, that he did so undertake, and that he even failed to take any step to procure the indorser's consent.

It was a stipulation for the benefit of Hunt alone, and he could, if so disposed, waive the advantage to accrue to him under the stipulation; and the question is, whether he did so. The fact is admitted that he received two of the instalments agreed to be paid by Knox, thus recognizing the force of the contract for at least two years after it was entered into, and there is no proof that he ever made the least objection on this ground. What, then, must be the inference? That this was either not a duty to be performed by Knox; or, if it was such duty, he, Hunt, was willing to waive performance.

Again, it is said that Andrew Knox failed to confess the judgment, as promised, in the United States Court in Louisiana. There is no proof either way on this point. It is true that Mr. Marshall says that the judgment was not confessed, to his knowledge; and I submit that this is but another mode of saying that he knows nothing on the subject. The proof is, indeed, exactly such as every person profoundly ignorant of the fact to be proved might perhaps venture to make. But be this as it may, it was a stipulation in the contract, exclusively for the benefit of Hunt, that the judgment should be confessed; and being for his benefit, he could of course waive the advantage to accrue to him under such judgment; and did he do so? He received two instalments under the contract, after the time for confessing the judgment had elapsed, thus admitting the full operation of the contract for nearly two years after the alleged default of Knox. But the claim upon which the confession was to be made, being under the control of Hunt, he was bound to bring it into court, in some manner, before Knox could act in the matter.

This, however, is not a very material point in the case. It is clear that the judgment was not to be confessed until the meeting of the court; and if the contract was ever operative for even a day, the security was discharged. It is clear that the contract was to take effect before the judgment could be confessed, and this being the case, the remedies to enforce the Mississippi judgment were suspended at least until a breach of the contract. Knox had a right to say to Hunt, Your hands are tied until I violate my contract, and I cannot violate it until the time of performance arrives. Here, then, was most clearly a binding contract for some period of time,

and if it ever once so operated as to release the surety, nothing less than his own consent could re-establish his liability.

For the purpose of illustrating the points just considered, suppose Hunt had sued Knox upon this agreement, could the latter have defended, on the ground that he had failed to procure the consent of Ambrose Knox, and that he had also failed to confess the judgments. Most certainly not; and why? Because Hunt could say, these are matters for my advantage; I have the power to waive them, and I elect to do so. Now, if he took, after these omissions of Knox, the advantages of the contract, must he, Hunt, not be held to have waived what he most clearly had the power to waive, without affecting the liability of Knox?

I will not, however, dwell longer upon this branch of the case, but will proceed to notice that part of the opinion which relates to the decree to be pronounced in this case. The property of the debtor being unincumbered, the question is whether this court, pronouncing such a decree as the chancellor should have pronounced, shall do more than leave the complainant to his remedy by his execution at law? The majority of the court have decided that a decree for the balance due upon the judgment must be rendered in this court, and a commissioner must be appointed to subject to sale the property of the debtor, if he should fail to pay this decree by a particular day. I cannot forbear expressing my strong and decided disapprobation of such a decree. Let us for a moment glance at the facts of the case. Ambrose Knox is the judgment debtor, and the proposition is first to render a decree against him upon this judgment. Secondly, there is no claim of any kind whatever by any person set up to his property named in the bill. And the next proposition is, that this property so situated shall be sold by a commissioner for the purpose of paying this decree, when there is not even a shadow of a lien pretended to exist against the property. I admit that there would at least be some foundation for such a decree, if the property was in the possession of or claimed by a third party, or if the object of the bill was to subject equitable assets, which could not be reached at law.

In the case of a third party claiming the property, the court would ascertain the amount due, so as to enable him to pay off the incumbrance if so disposed, without a sale of the property. The

decree in such case would be, unless such third party paid by a particular day the amount decreed, the property should be sold. He is proceeded against on the ground that he holds property, which ought to be applied to the debts of another.

But here there is no claim, title, or possession adverse to Ambrose Knox, and consequently, no impediment from this source, to an execution at law. The case comes to the simple proposition to render a decree upon a judgment at law, to be satisfied out of the general property of the debtor; and if such decree be rendered, why not let it be executed as any other purely money decree, by a writ of *fieri facias*, as provided by the statute? for, to give jurisdiction over the property, so as to decree a sale, it must appear that the bill was filed rather to enforce a lien, or to reach the property in the hands of a third party. It is true the bill intimates that it is probable such third party might assert a claim, but it turned out before the trial and at the trial, that no such claim was or would be interposed. The debtor's title was virtually confessed, and the remedy at law, if the judgment existed, shown to be unobstructed. As no third party is to be charged by the decree, no lien to be enforced against the property, I again repeat that it is virtually rendering a decree upon a judgment at law, to be satisfied out of any estate of the debtor subject to execution on such decree.

But the court cite authorities to sustain their position. They all establish what I have admitted, that when a third party is to be charged, or the bill is to reach equitable assets, the court will make a decree applicable to the case. The case in 20 Johnson, 554, was to subject bank stock and equitable assets to the payment of a judgment. The same may be said as to the case in 1 Paige's Reports, 637. The case in 3 Kelly, 449, was to have an account taken as to the amount due upon a mortgage, and to have the balance of the mortgaged property applied to the complainant's judgment. The case in 7 Ala. I have not been able to find, but I presume it is not different from the rule I have admitted. I am willing, however, to trust the case at bar upon admitted principles of equity. The judgment being a legal demand, cannot, as a general rule, be the foundation of a decree in equity. A court of equity will only decree on such demand, when there is no adequate legal remedy, or when there is

a further object sought to be attained, such as enforcing a lien for the payment of the debt, or the like.

But the true reason for the decree, and I am willing to admit that it is the best reason that can be given, is that, if the complainant be left to his execution, he would be without remedy, because his judgment is barred by the Statute of Limitations. To relieve himself from such a defence, he must show that it is one which the debtor ought not in conscience to make; and if this showing is made, it is difficult to perceive why it could not be made in every conceivable case.

The debtor has done nothing to prevent the creditor from issuing his execution at any time; and surely it will not be said, that the agreement with Andrew Knox, which might be disregarded by the creditor at any time, according to the opinion of the court, could be treated as an obstacle to an execution on the judgment. But this agreement was at an end on the 5th of February, 1854, and the bar did not become complete until the 20th of November, 1855, nearly two years after the agreement had expired by its terms. It is then simply a case of negligence, where the party slumbered of his own will upon his rights for more than seven years.

My opinion is that the decree ought to be affirmed.